**EMERGENCY ONE, INC., Plaintiff,**

v.

**WATEROUS CO., INC., Pierce Manufacturing, Inc., and Hale Products, Inc., Defendants.**

No. 97–C–692.

United States District Court,
E.D. Wisconsin.

Oct. 20, 1998.

W. Stuart Parsons, Quarles & Brady, Milwaukee, WI, Anthony Feeherry, Chris Holding, Goodwin, Procter & Hoar, Boston, MA, Keith D. Shugarman, Goodwin, Procter & Hoar, Washington, DC, Kim Wehrenberg, Federal Signal Corp., Oak Brook, IL, for Plaintiff.

Scott Hansen, Reinhart, Boerner, Van Dueren, Norris & Rieselbach, Milwaukee, WI, Gary M. London, Burr & Forman, Birmingham, AL, for Defendant Waterous.

Attorney James McKeown, Foley & Lardner, Milwaukee, WI, for Defendant Pierce Manufacturing, Inc.

James Greer, Whyte, Hirschboeck & Dudek, Milwaukee, WI, Paul Cuomo, Collier, Shannon, Rill & Scott, Washington DC, for Defendant Hale Products Inc.

## DECISION AND ORDER

ADELMAN, District Judge.

This decision considers the scope of the Wisconsin antitrust statutes with respect to interstate trade and, in particular, the relevant effect of the 1980 amendments to Wis. Stat. Chapter 133, the state law regulating trusts and monopolies. Plaintiff Emergency One, Inc. ("E–One"), a Florida-based manufacturer of fire trucks, brings this action against defendants Waterous Company, Inc. ("Waterous"), Pierce Manufacturing, Inc. ("Pierce") and Hale Products, Inc. ("Hale"), on twenty-two counts alleging violations of state and federal antitrust law, state unfair trade practices and other economic torts. Defendants have moved to dismiss all state claims brought under Wis. Stat. §§ 133.03 and 100.20 (counts X–XVIII of the amended complaint), arguing principally that the complaint alleges predominantly interstate transactions not covered by Chapter 133. For the reasons discussed below, defendants' motions to dismiss these claims will be granted.

### I. FACTUAL BACKGROUND

E–One is an original equipment manufacturer ("OEM") of fire trucks. E–One's principal OEM competitor is defendant Pierce, incorporated and located in Wisconsin. According to the amended complaint, Pierce was founded in about 1913 and until recently was the leading OEM in the United States. E–One entered the fire truck business in 1975 and has grown substantially by pioneering innovative features such as aluminum body trucks.

Defendant Waterous is a Minnesota corporation that manufactures, among other things, items known as mid-ship mounted fire pumps. Waterous' chief fire pump competitor is defendant Hale, a Pennsylvania corporation. Together, Waterous and Hale allegedly account for more than ninety percent of all the mid-ship mounted fire pumps produced in the United States. These fire pumps are one of the key components of the fire trucks manufactured by OEMs like E–One and Pierce.

Both E–One and Pierce sell fire trucks to municipalities and other purchasers across

the United States, including in Wisconsin. The amended complaint estimates that 3500 to 4000 fire trucks are purchased by fire departments in the United States each year. Typically, fire trucks are purchased through a public bidding process in which the purchasing entity details its desired fire truck specifications. OEMs often maintain a network of dealers who sell fully assembled fire trucks; certain OEMs also make direct sales to purchasing fire departments. E–One claims that it has maintained dealers throughout the country for years, including the following in Wisconsin: Great Lakes Fire Equipment, in Waukesha (since 1996); Five Alarm, in Fort Atkinson (1995–96); and Fireline, in Union Grove (1992–94). At times when it has not had dealers located in Wisconsin, E–One claims to have made direct sales to fire truck purchasers in the state.

Plaintiff's amended complaint alleges two conspiracies—one horizontal and one vertical—that have allegedly choked the U.S. market for fire pumps for many years. First, E–One alleges a horizontal customer allocation conspiracy between Waterous and Hale. Specifically, plaintiff alleges that Waterous and Hale divided the nationwide OEM customer base between themselves, restricting each fire truck manufacturer to only one pump supplier. Waterous supplied mid-ship mounted fire pumps to Pierce; Hale supplied the same to E–One and other OEMs. For years, Waterous allegedly refused to sell these fire pumps to E–One on any basis whatsoever, even at prices above the discounted prices paid by Pierce. Under this "duopolistic" arrangement, plaintiff and other OEMs were forced to pay artificially inflated pump prices. Additionally, because the ultimate purchasers of fire trucks—municipalities and fire departments—often need trucks made with fire pumps from a specific manufacturer in order to maintain fleet commonality for operational and maintenance reasons, the fact that E–One could not produce trucks with Waterous pumps limited its ability to bid on many fire truck contracts.

Plaintiff also alleges a vertical exclusive dealing conspiracy between Waterous and Pierce, in which Pierce, the dominant seller of Waterous pumps, restricted Waterous' dealings with actual and potential pump customers. For example, plaintiff alleges that

Pierce complained to Waterous when E–One was able to install approximately five Waterous mid-ship mounted fire pumps due to E–One's acquisition of a Canadian OEM that had been a Waterous customer. Plaintiff alleges that Pierce demanded that Waterous prevent E–One from obtaining further Waterous pumps in this indirect way. Waterous subsequently terminated the Canadian OEM as a customer and made it agree not to transfer any more Waterous pumps to E–One, as a condition of reinstatement.

The Federal Trade Commission ("FTC") pursued antitrust proceedings against Waterous and Hale in the early 1990s. The FTC proceedings concluded in 1996 consent orders enjoining both Waterous and Hale "from entering into, continuing, or enforcing any agreement or understanding requiring an OEM to purchase fire pumps on an exclusive basis for a period of twenty years." (Am. Compl. at 92.)

## II. ANALYSIS

Waterous, Hale and Pierce all filed motions to dismiss certain state claims under Fed.R.Civ.P. 12(b)(6). In reviewing a complaint pursuant to any motion to dismiss, I assume all well-pleaded facts to be true, and draw all reasonable inferences from those facts in favor of the plaintiff. *Gutierrez v. Peters,* 111 F.3d 1364, 1368–69 (7th Cir.1997). This court will dismiss an action or a claim pursuant to a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted if, under this generous standard, the plaintiff can prove no set of facts that would entitle it to relief. *See* Fed.R.Civ.P. 12(b)(6); *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir. 1997); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### A. Claims Based on Wis. Stat. § 133.03

Defendants argue that plaintiff's factual allegations, even if true, fail to state a claim upon which relief can be granted under Wis. Stat. §§ 133.01–.18., Wisconsin's chapter regulating trusts and monopolies. Specifically, defendants argue that plaintiff's allegations refer to entirely interstate transactions, rather than wholly or even predominantly *intra*

state transactions. According to defendants, Wisconsin courts have long held that a conspiracy relating to largely interstate rather than intrastate commerce is flatly beyond the reach of state antitrust statutes and subject only to federal law. After attempting to play up the scant Wisconsin connections in its complaint, plaintiff responds that the 1980 amendments to Wis. Stat. Chapter 133—which extensively revised Wisconsin law on trusts and monopolies—were consciously intended to expand the scope of the antitrust statutes to reach even predominantly interstate transactions. Wisconsin courts have not directly considered how the 1980 amendments may have altered the coverage of Chapter 133 with respect to interstate commerce. In the absence of a decision by the highest state court, I decide this matter as I believe the Wisconsin Supreme Court would if squarely presented with the issue. *L.S. Heath & Son, Inc. v. AT & T Info. Systems,* 9 F.3d 561, 574 (7th Cir.1993).

### 1. Effect of the 1980 Amendments

■ Since the early part of this century, Wisconsin courts have repeatedly, if summarily, noted that the state's antitrust laws were intended to apply to intrastate commerce, while the federal Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, applied to interstate transactions. *See, e.g., Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914); *State v. Lewis & Leidersdorf Co.,* 201 Wis. 543, 549, 230 N.W. 692 (1930); *Reese v. Associated Hosp. Serv., Inc.,* 45 Wis.2d 526, 532, 173 N.W.2d 661 (1970); *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 410, 198 N.W.2d 363 (1972); *State v. Waste Management of Wis., Inc.,* 81 Wis.2d 555, 574, 261 N.W.2d 147 (1978). The Wisconsin Supreme Court reiterated this idea in typical language in June 1980:

> We have repeatedly stated that § 133.01, Stats., was intended as a reenactment of the first two sections of the federal Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1 and 2, with application to intrastate as

distinguished from interstate transactions and that the question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal court decisions under the Sherman Act. *Grams v. Boss,* 97 Wis.2d 332, 346, 294 N.W.2d 473 (1980).[1] Most recently, this language was recycled in *American Med. Transp., of Wis. v. Curtis–Universal, Inc.,* 148 Wis.2d 294, 299, 435 N.W.2d 286 (Ct.App. 1988).

For present purposes, what is significant about this oft-cited string of precedent is that, for the most part, these decisions reflexively restate the intrastate/interstate distinction as a mere preface to the courts' reliance on federal cases in interpreting Wisconsin antitrust law. With the possible exception of *Pulp Wood,* none of the above cases purports to examine the scope of state antitrust law with respect to specific allegations of interstate commerce, and thus none sheds much light on where or how the line should be drawn in a case like the one before me. Defendants assert that the question has always been one of "predominance"—that is, if the complaint alleges "predominantly" intrastate transactions, then Chapter 133 applies. If, on the other hand, the complaint sets forth "predominantly" interstate activities, the Sherman Act applies.

Plaintiff, while perhaps accepting this characterization in part, argues that the statutory landscape shifted radically in 1980. In the 1979 legislative session, the Wisconsin legislature finally succeeded in comprehensively revising the state laws regulating trusts and monopolies. Prior to that, Chapter 133 was the product of piecemeal legislation dating from 1893. In addition to simplifying and clarifying the statutory language in many respects, the 1980 amendments made several substantive changes to state antitrust law. Among the more significant changes, the new chapter: allows the state and its political subdivisions to sue for treble damages if injured by antitrust violations, *see* Wis. Stat. §§ 133.02(3) & 133.18(1)(a); specifies a six-year statute of limitations for all

---

**1.** The 1980 amendments to Wis. Stat. Chapter 133 went into effect on May 8, 1980—*before* decisions were issued in *Grams* and in *Independent Milk Producers Co-op v. Stoffel,* 102 Wis.2d 1, 6–7, 298 N.W.2d 102 (Ct.App.1980), a case citing similar precedent on interstate/intrastate transactions. However, both of these cases addressed conduct governed by pre-amendment antitrust law and thus do not provide direct guidance on the significance of the 1980 changes.

civil antitrust actions, running from the discovery of wrongful acts, *see* Wis. Stat. § 133.18(2)-(4); and explicitly provides a cause of action for indirect purchasers injured by illegal price-fixing, *see* Wis. Stat. § 133.18(1)(a). Overall, the 1980 amendments enhance the scope and efficacy of the state antitrust enforcement scheme, at times providing redress for injuries not available under federal law.[2]

Plaintiff identifies two specific statutory changes to support its argument that interstate transactions formerly beyond the reach of Wisconsin antitrust law now fall within its domain. First, plaintiff points out that the amended § 133.03 (formerly § 133.01)—which prohibits contracts or conspiracies "in restraint of trade or commerce" and any attempt to monopolize "any part of trade or commerce"—eliminates the phrase "in this state," previously modifying and arguably limiting "trade or commerce."[3] From this, plaintiff concludes that the legislature meant to subject even interstate commerce with little connection to Wisconsin to state regulation. As additional support for this reading of § 133.03, plaintiff points to the following sentence in the new section on legislative intent: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." Wis. Stat. § 133.01 (1998).

Defendants have provided the court with copies of a Wisconsin Legislative Council staff memorandum and a Legislative Reference Bureau ("L.R.B.") analysis, both describing proposed changes to the state antitrust laws, many of which were ultimately enacted in 1980. Defs.'s Exs. A & B. In addition, I have reviewed the entire Legislative Council bill file for 1979 Assembly Bill 831—eventually passed as the amended Chapter 133, with some changes—as well as the drafting records of 1977 Assembly Bill 685 and 1975 Senate Bill 666, earlier at-

2. Federal statutes establish a *four*-year statute of limitations for private antitrust actions. 15 U.S.C. § 15b. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), held that indirect purchasers were *not* entitled to recover treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15(a), for price-fixing in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

3. This section was condensed and otherwise reworded in 1980. Previously, the section read in part:

> (1) Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal. Every combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition in the supply or price of any article or commodity in general use *in this state*, to be produced or sold therein, or constituting a subject of trade or commerce therein, or which combination, conspiracy, trust, pool, agreement or contract shall in any manner control the price or any such article or commodity, fix the price thereof, limit or fix the amount or quantity thereof to be manufactured, mined, produced or sold *in this state,* or fix any price or figure in which its price to the public shall be in any manner controlled or established, is hereby declared an illegal restraint of trade. Every person, corporation, copartnership, trustee or association who shall either as principal or agent become a party to any contract, combination, conspiracy, trust, pool or agreement herein declared unlawful or declared to be in restraint of trade, or who shall combine or conspire with any other person, corporation, copartnership, association or trustee to monopolize or attempt to monopolize any part of the trade or commerce *in this state* shall forfeit for each such offense not less than $100 nor more than $5,000. Any such person, corporation, copartnership, trustee or association shall also be liable to any person transacting or doing business *in this state* for threefold the damages he may sustain by reason of the doing of anything forbidden by this section, and the cost of suit including a reasonable attorney's fee. As used in this section, the words "article or commodity in general use *in this state"* includes newspapers, magazines, periodicals, and advertising, including radio advertising. . . .

Wis. Stat. § 133.01(1) (1977) (emphasis added). After 1980, the comparable section reads:

> (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. Every person who makes any contract or engages in any combination or conspiracy in restraint of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, $50,000, or be imprisoned for not more than 5 years, or both.
>
> (2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, $50,000, or be imprisoned for not more than 5 years, or both.

Wis. Stat. § 133.03 (1998).

tempts to overhaul the antitrust statutes. Nowhere in this material do I find direct support for plaintiff's argument. The text of the amended § 133.03 first appears in the 1975 bill in almost exactly its current form and lacking the phrase "in this state." *See* L.R.B. file, 1975 S.B. 666. The omission is neither noted nor commented upon in the drafting records or the L.R.B. analysis. *Id.* Further, the Legislative Council bill file, which contains numerous staff memos, constituent suggestions, and correspondence from business leaders and attorneys familiar with Wisconsin antitrust law, fails to disclose a single reference to a conscious design to significantly expand the state's regulation of interstate trade by deleting the words "in this state" from § 133.03. *See* Leg. Council file, 1979 A.B. 831.

A more plausible explanation for the disappearance of this phrase is that, like fully two-thirds of the language in § 133.03 prior to revision, the words were excised as non-essential or redundant. *See supra* note 3. The limiting phrase "in this state" appears five times in the pre-amendment § 133.01. Only once do the words actually modify "trade or commerce"; elsewhere the section refers to commodities "in use in this state" or "manufactured, mined, produced or sold in this state" and to persons "transacting or doing business in this state." *Id.* It is worth noting that in none of these contexts is the "in this state" limitation equivalent to limiting the statute's regulatory reach to purely intrastate transactions. Rather, what is suggested is that the regulated activity must adversely *affect* trade or commerce in this state. In fact, the amendments preserve the first and key sentence of the pre–1980 section without significant alteration. Then, as now, the sentence tracks the language of § 1

of the Sherman Act [4] and includes no "in this state" limitation: "Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal." Wis. Stat. § 133.01(1) (1977).

In fact, the best indication that state legislators in 1980 meant to hold interstate actors accountable in certain situations under Wisconsin antitrust law may be not the unremarked-on removal of "in this state" from § 133.03, but, rather, the much-discussed inclusion of an indirect purchaser claim under § 133.18. *See* Wis. Stat. § 133.18(1)(a). By explicitly providing indirect purchasers with a cause of action for injuries sustained by illegal price-fixing, state legislatures such as Wisconsin's sought to "overrule" the effect of the Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Widely criticized, *Illinois Brick* held that indirect purchasers are not entitled to recover treble damages for injuries caused by price-fixing in violation of the Sherman Act. *Id.* at 728, 97 S.Ct. 2061; 15 U.S.C. §§ 1 & 15(a). In the wake of that decision, a number of states passed legislation insuring that indirect purchasers would continue to have a remedy under state law. *See California v. ARC America Corp.,* 490 U.S. 93, 98 n. 3, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). To the extent that the state indirect purchaser claim was meant to replace the lost federal cause of action—as seems clear from the numerous references to *Illinois Brick* in the Legislative Council bill file—the 1980 amendments clearly assume that Chapter 133 may reach interstate conduct. Indeed, the prototypical indirect purchaser action would vindicate far-flung consumers for the indirect costs of price-fixing conducted on a national scale.[5]

---

4. Section 1 of the Sherman Act begins: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce *among the several States, or with foreign nations,* is hereby declared to be illegal." 15 U.S.C. § 1 (emphasis added).

5. Plaintiff cites a persuasive example of this type of suit in Wisconsin—*Carlson v. Abbott Labs.,* No. 94CV002608, Milwaukee County Circuit Court—an indirect purchaser class action brought by Wisconsin retail purchasers and consumers of infant baby formula. The *Carlson* plaintiffs claimed injuries from a wholesale price-fixing

conspiracy extending beyond this state. In an unpublished oral decision denying summary judgment to defendant manufacturers, Circuit Court Judge William J. Haese noted:

Wisconsin's legislature has created an additional category of plaintiff who can recover under the state antitrust law but who cannot recover under federal law. The legislature has also eliminated the language applying the statute to illegal conduct in this state. The legislature added the ability for indirect or retail purchasers to pursue their damages under the antitrust chapter pursuant to 133.18. I find no evidence that the legislature intended to limit

In sum, legislative history and the text of the statute itself suggest that plaintiff's claim of dramatic expansion in 1980 by the deletion of "in this state" from § 133.03 is overstated or more properly attributed to other statutory changes, such as the indirect purchaser remedy provided by § 133.18. On the other hand, plaintiff concedes too much by arguing that the 1980 amendments altered a rigid, pre-existing interstate/intrastate dichotomy in Wisconsin antitrust case law. The following discussion arrives at a different conclusion.

**2. Relevant Case Law**

The earliest case cited to support the assertion that interstate and intrastate transactions are subject to mutually exclusive federal and state antitrust regulation in Wisconsin is *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 147 N.W. 1058 (1914). *Pulp Wood* involved antitrust allegations surrounding a series of contracts to supply wood pulp to Wisconsin paper manufacturers. The contracts required the paper mills to purchase wood pulp from a single Wisconsin supplier. Because the wood originally furnished to this supplier came from Wisconsin, Minnesota, Michigan and Canada, however, the Wisconsin Supreme Court held that the contracts impacted interstate commerce and chose to apply the Sherman Act. *Pulp Wood* at 615, 147 N.W. 1058. Interestingly, *Pulp Wood* does not unequivocally bar the simultaneous application of state antitrust law, although such a stance would have been entirely in keeping with the prevailing federal constitutional law of the time.[6] *See, e.g., id.* at 616, 147 N.W. 1058 ("So far as this particular case goes, we observe very little difference whether the state or federal statutes or both apply."), 625 ("If the [state] statute has any application to the facts in this

case, it should receive the same interpretation that was placed on the federal act...").

Subsequent cases have tended to cite *Pulp Wood* summarily for the proposition that Wisconsin antitrust law, though taken from the federal statutes, applies "to intrastate as distinguished from interstate transactions"— with the goal of citing analogous federal decisions in construing the state statutes. *See* cases cited *supra.* When state courts have paused to consider the application of Chapter 133 to facts clearly involving interstate commerce, however, the line is not so clearly drawn.

In *State v. Allied Chem. & Dye Corp.*, 9 Wis.2d 290, 101 N.W.2d 133 (1960), the Wisconsin attorney general brought price-fixing charges against several domestic and foreign corporations engaged in the manufacture and sale of the chemical product calcium chloride in this state. The complaint alleged that some but not all of the acts constituting a nationwide conspiracy in restraint of trade occurred in Wisconsin. *Id.* at 291, 101 N.W.2d 133. Similar actions by the same defendants had been the subject of FTC proceedings over an extended period. *Id.* at 293–94, 101 N.W.2d 133. In *Allied Chemical,* the defendants asserted *inter alia* that all sales of calcium chloride in Wisconsin were made in interstate commerce; that none of the defendants owned or operated a manufacturing plant, sales office or warehouse in Wisconsin; that the chemical was produced entirely out of state; and that each defendant routinely sold calcium chloride on a nationwide basis. *See id.* at 292–93, 101 N.W.2d 133. Based on these assertions, the defendants moved for summary judgment, arguing that Chapter 133 did not reach the conduct at issue.

recovery for indirectly injured Wisconsin citizens to prohibited conspiracies occurring solely within the borders of Wisconsin. To the contrary, I find an emphatic attempt to promote competition and punish conduct such as been alleged in this case.
*Carlson v. Abbott Labs.*, No. 94CV002608 (Milwaukee County Cir.Ct. Feb.27, 1995) (Tr. of Mot. Hr'g at 16).

**6.** A recent Alabama Supreme Court case recounts this history, confirming that a decisive

factor in most early state antitrust cases was the Supreme Court's prevailing "dual sovereignty" theory. This theory set forth distinct and mutually exclusive zones of jurisdiction for the states and the federal government. *See generally Abbott Labs. v. Durrett,* — Ala. —, —, — So.2d —, 1998 WL 436062, *14–*17 (July 31, 1998); Lawrence H. Tribe, *American Constitutional Law* §§ 5–4, 307–08 (2d ed.1988) (noting the consistent dichotomy between interstate and intrastate commerce in Supreme Court jurisprudence prior to the New Deal).

The Wisconsin Supreme Court rejected the defendants' argument in strong language and denied summary judgment. After examining both the state and federal legislative enactments in the antitrust field, the court concluded that there was no conflict between the two, as the state statutes made no attempt to burden interstate commerce. *Id.* at 295, 101 N.W.2d 133.

> The Wisconsin statutes were enacted in the exercise of the police powers of the state. The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy. The people of Wisconsin are entitled to the advantages that flow from free competition in the purchase of calcium chloride and other products, and if the state is able to prove the allegations made in its complaint it is apparent that the acts of the defendants deny to them those advantages.

*Allied Chemical* at 295, 101 N.W.2d 133.

In many respects, the facts of *Allied Chemical* are strikingly similar to the case at bar. Defendants in the present case may argue that *Allied Chemical* addressed the question of preemption, merely confirming, as is now widely conceded, that federal law does not occupy the antitrust field to the preclusion of state legislation. *See, e.g., ARC America,* 490 U.S. at 101–02, 109 S.Ct. 1661. But while the issue may have been framed as one of preemption, the resulting decision clearly bears on the legislative scope of Chapter 133. In short, the court assumes that defendants' conspiratorial acts—both in and out of Wisconsin—may be subject to Chapter 133 under certain circumstances.

*State v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 144 N.W.2d 1 (1966), is another notable precedent suggesting that even before 1980 Wisconsin courts did not exclude significantly interstate conspiracies from state antitrust regulation in the absolutist fashion that defendants maintain. *Milwaukee Braves* concerned the decision by the National League of Professional Baseball Clubs ("League") to uproot the highly successful Braves franchise from Milwaukee to Atlanta in 1965, to great civic consternation. *Id.* at 702–03, 144 N.W.2d 1. Wisconsin sued the League and the corporate owners of the ten League teams under state antitrust law, for restraining trade and commerce in major league baseball in Wisconsin. *Id.* at 703–04, 144 N.W.2d 1.

A sharply divided Wisconsin Supreme Court ultimately dismissed the action, finding that the long-standing exemption of organized baseball from antitrust scrutiny suggested a federal policy of approval for baseball's monopoly structure, which must necessarily trump state antitrust initiatives against the League. *See id.* at 719–32, 144 N.W.2d 1. But the majority left little doubt that, in the absence of the unique exemption afforded to professional baseball, acts such as those alleged in the complaint were within the purview of Chapter 133. The court noted, for example, that "[t]he substantial injury to business activity within Wisconsin caused by the defendants' exercise of their monopoly power is clear, and we assume, at this point, that a violation of Wisconsin law has occurred if our law can be applied." *Id.* at 719, 144 N.W.2d 1. Further, the fact that defendants' monopoly control over the national pastime was quintessentially interstate in nature did not affect the applicability of state antitrust law: "The state may, ordinarily, protect the interests of its people by enforcing its antitrust act against persons doing business in interstate commerce..." *Id.* at 721, 144 N.W.2d 1.

Thus it would appear that, whatever the effect of the 1980 amendments to Chapter 133, the Wisconsin Supreme Court has for some time interpreted the state antitrust statutes to reach interstate activities in certain circumstances and has rejected a mutually exclusive vision of state/federal antitrust enforcement. Rote reliance on the "intrastate as distinguished from interstate," *Pulp Wood* to *Grams* line of precedent to dismiss state antitrust claims with any interstate aspect is therefore misplaced and inconsistent with Wisconsin precedent. *See, e.g., Maryland Staffing Servs., Inc. v. Manpower, Inc.,* 936 F.Supp. 1494, 1504–05 (E.D.Wis.1996) (dismissing state antitrust claims).

But if Wisconsin case law makes clear that Chapter 133 is intended to apply to interstate transactions in some situations, the state supreme court has never spoken directly to the

question of when this application is or is not appropriate. Again, in the absence of direct state precedent, I evaluate this matter as I believe the Wisconsin Supreme Court would if asked to do so. *L.S. Heath*, 9 F.3d at 574.

### 3. When Does Chapter 133 Apply to Interstate Commerce?

Several constitutional principles mark the outer limits of Wisconsin's power to assert regulatory control over interstate activities through state antitrust legislation. The Commerce Clause, art. I, § 8; the Supremacy Clause, art. VI, cl.2; the Full Faith and Credit Clause, art. IV, § 1; and the Due Process Clause, amend. XIV, § 1, are all variously cited as theoretical limitations on a state's authority to circumscribe persons or activities beyond its territorial boundaries when the state's interests are affected. *See generally* Herbert Hovenkamp, *State Antitrust in the Federal Scheme*, 58 Ind. L.J. 375 (1983) (discussing limits on state legislative jurisdiction). These constitutional limits are not directly at issue in the present case;[7] they are instead an instructive backdrop to the more specific questions before me: To what extent, in enacting and amending Chapter 133, has the Wisconsin legislature exercised its jurisdiction to regulate interstate conduct in which the state has a legitimate interest? And more pertinently, what is the appropriate standard with which to apply Chapter 133 to that conduct?

At one end of the spectrum, a standard which insists that Wisconsin antitrust law applies only to purely intrastate trade or commerce has been clearly rejected by Wisconsin courts. *See supra* discussion. As the Seventh Circuit has noted, such a high threshold would nullify state antitrust law because "there are virtually no sales, in [Wisconsin] or anywhere else in the United States, that are intrastate in *that* sense." *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 613 (7th Cir. 1997). But short of this exacting standard, the inevitable mixture of interstate and intra-

state elements in an antitrust action can be measured against a number of yardsticks. Three possibilities—culled from the parties' implicit suggestions and borrowed from personal jurisdiction and choice of law doctrine—merit discussion. I will call them a predominance standard, a contacts-based standard, and an adverse effects standard.

#### a. Predominance standard

Defendants characterize the standard in Wisconsin for deciding whether or not the state antitrust statutes apply to allegations involving interstate commerce as a matter of "predominance." Pierce asserts that "since as early as 1914, the Wisconsin Supreme Court has held that actions involving predominantly *interstate* transactions are beyond the intended reach of the Wisconsin antitrust act." (Reply at 3.) Waterous asserts that "the Wisconsin statute applies to transactions and commerce which are predominantly intrastate in nature, while the federal statute applies to transactions and commerce which are predominantly interstate in nature." (Reply at 7.) Neither defendant cites Wisconsin precedent which directly articulates the appropriate test as a predominance standard.

In fact, there is none. As my earlier discussion suggests, a careful reading of Wisconsin cases does not support the thesis that *either* state *or* federal antitrust law, but not both, may apply to a given antitrust action. And indeed, that is what a standard focused on predominance must imply. An action cannot be both predominantly interstate in nature and predominantly intrastate in nature; it must be one or the other. Framing the issue as one of predominance thus becomes a way of reintroducing federal preemption of state antitrust law—a result consistently rejected by the Supreme Court. Congress intended the federal antitrust laws to supplement and not displace state regulation. *ARC America*, at 102, 109 S.Ct. 1661. Further, there is no contention here that application of Chapter 133 "stands as an obstacle to the

---

7. The Supreme Court has upheld the application of specific state antitrust statutes which clearly affect interstate commerce. *See, e.g., California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

*See also Heath Consultants, Inc. v. Precision Instruments, Inc.*, 247 Neb. 267, 527 N.W.2d 596, 606–07 (Neb.1995) (citing state and federal cases concluding that the Constitution and federal law do not bar application of state antitrust statutes to interstate commerce).

accomplishment and execution of the full purposes and objectives of Congress" in passing the Sherman Act. *Id.* at 101, 109 S.Ct. 1661 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Therefore a standard which results in the mutually exclusive application of state and federal antitrust law is contrary to Congressional intent and Supreme Court precedent.

Equally important, a predominance standard does not advance the legislative intent behind Chapter 133 or Wisconsin's legitimate interest in providing a remedy for citizens injured by monopolistic interstate activity. The *Milwaukee Braves* decision offers perhaps the most vivid example of a manifestly interstate conspiracy to restrain trade with nonetheless profoundly intrastate consequences. *Milwaukee Braves,* 31 Wis.2d 699, 144 N.W.2d 1. Even aside from the baseball exemption, under a predominance standard the Wisconsin antitrust statutes would not have extended to the predominantly interstate actions that greatly injured the state's trade and commerce in major league baseball.

### b. Contacts-based standard

E–One argues that Chapter 133 must reach the interstate transactions which form the bulk of the amended complaint, asserting that "*substantial actions and effects occurred in Wisconsin.*" (Opp'n Br. at 5.) In principle, then, plaintiff espouses a more effects-based standard; in fact, plaintiff's specific allegations suggest its reliance on a contacts-based standard, emphasizing the nature and degree of defendants' contacts with Wisconsin.

There are at least two contacts-based standards which govern different but somewhat analogous areas of jurisprudence. The concept of "minimum contacts" is of course taken from *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny and the law surrounding personal jurisdiction. The basic holding of *International Shoe* is that, if a defendant is not present within a forum state, due process allows personal jurisdiction to be founded on the defendant's minimum contacts with the state. *Id.* at 316, 66 S.Ct. 154. Because the due process analysis in this area has as its primary concern "traditional notions of fair play and substantial justice," *id.*

(quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)), the Supreme Court has held that sufficient minimum contacts would show that a defendant has purposefully availed himself of the privilege of conducting business in the forum state and could reasonably foresee being sued there. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Consequently, contacts such as plaintiff alleges in the present case— chiefly that Pierce's alleged conspiratorial actions occurred through its facilities in Wisconsin—would no doubt be considered significant under a minimum contacts standard. Indeed, personal jurisdiction is not contested by defendants.

However, what is at issue in this case is not the jurisdiction of the court over defendants but the legislative jurisdiction of Chapter 133 over defendants' conduct. Legislative jurisdiction is the power of a state to extend its law to a given transaction. The concepts of judicial jurisdiction and legislative jurisdiction are linked but distinct, and are legitimized and constrained by different policies. While the bounds of personal jurisdiction are marked by due process fairness to the litigant, legislative jurisdiction is generally a broader concept, justified by a state's legitimate interest in its citizens' welfare and limited primarily by principles of comity and federalism. *See Kulko v. Superior Ct. of Cal.,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (finding that personal jurisdiction over nonresident father was not reasonable under due process standards, although welfare of resident children may justify application of California law in action for child support); Hovenkamp at 390–91.

A more apt analogy for the legislative jurisdiction at issue here—the scope of state antitrust law with respect to interstate transactions—may be to choice of law doctrine. A second contacts-based standard can be extracted from choice of law cases—a "significant contacts" or "aggregation of contacts" standard. *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 308, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). The question in *Allstate Ins. Co. v.*

*Hague* was whether Minnesota could apply its substantive law to permit stacking of uninsured motorist provisions, although the precipitating accident occurred in Wisconsin and the decedent and both drivers were Wisconsin residents. *Id.* at 304–06, 101 S.Ct. 633. The decedent, however, had been a member of the Minnesota workforce; the defendant insurance company was doing business in Minnesota; and the surviving spouse had become a Minnesota resident prior to initiating the action. *Id.* at 313–20, 101 S.Ct. 633. The Supreme Court held that Minnesota, the forum state, could apply its own substantive law because these contacts were sufficient: "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* at 312–13, 101 S.Ct. 633.

Although the terms "significant contacts" and "minimum contacts" may tend to suggest that choice of law is subject to a higher contacts threshold than personal jurisdiction, this is not necessarily the case. *See id.* at 317 n. 23, 101 S.Ct. 633 ("[B]oth inquiries 'are often closely related and to a substantial degree depend upon similar considerations.' "); Hovenkamp at 392 n. 96. What is clear is that choice of law analysis weighs more heavily the interest of the forum state in the outcome of the litigation, which is more akin to assessing the proper scope of legislative jurisdiction.

Despite this natural affinity between choice of law doctrine and questions of legislative jurisdiction, the nature of antitrust allegations counsels against the use of even a significant contacts standard. A state's choice-of-law interest in the outcome of litigation may rest on a number of general considerations having nothing to do with the specific goals of antitrust law. Thus, using a contacts-based standard to govern the application of state antitrust law to interstate commerce will often produce a field of regulated interstate activity that is much wider than justified by the legislative intent of the statute or the legitimate goals of the state. Given the interstate nature of many price-fixing conspiracies and the fact that diffuse, nationwide sales can theoretically establish sufficient contacts in virtually every state, a contacts-based standard may permit the application of state antitrust law in situations where trade or economic competition within the state have not been significantly injured. The existence of indirect purchaser remedies in many state antitrust statutes merely exacerbates this problem, as consumers several times removed in the market from conspiring defendants can still be injured by price-fixing. *See* Hovenkamp at 393–95.

For these reasons, I do not believe that Wisconsin courts would employ a contacts-based standard to govern the application of Chapter 133 to interstate transactions. The clear legislative intent of the state's antitrust law is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01. Although, as plaintiff emphasizes, the legislature intends the antitrust chapter "be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." *id.*, a contacts-based standard would not maximally or even necessarily further this goal in Wisconsin.

#### c. Adverse effects standard

An adverse effects standard would extend the jurisdictional scope of Wisconsin antitrust law to unlawful activity which has significantly and adversely affected trade and economic competition within this state. This standard is consistent with both Wisconsin precedent and judicial interpretations of the scope of federal antitrust law. Most importantly, it comports with the legislative intent of Chapter 133:

> It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry. . . .

Wis. Stat. § 133.01. In light of this clear legislative directive, Wisconsin courts would follow an adverse effects standard if asked to consider the potential application of the state

antitrust statutes to allegations involving interstate trade.

Impliedly, the Wisconsin Supreme Court has already done so. Both *Allied Chemical* and *Milwaukee Braves,* discussed *supra,* contain forceful language suggesting that the legislative jurisdiction of Chapter 133 corresponds to the state's interest in punishing behavior that threatens healthy economic competition. *See Allied Chemical* at 295, 101 N.W.2d 133 (" The Wisconsin statutes were enacted in the exercise of the police powers of the state. The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy."); *Milwaukee Braves* at 721, 144 N.W.2d 1 ("The state may, ordinarily, protect the interests of its people by enforcing its antitrust act against persons doing business in interstate commerce...").

Moreover, an adverse effects standard coincides with Supreme Court pronouncements on the scope of federal antitrust law with respect to foreign or extraterritorial transactions. "A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). And "it is well-established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some *substantial effect* in the United States." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (emphasis added). Wisconsin case law makes clear that federal court decisions construing the Sherman Act control application

of Wisconsin antitrust law, including determination of "what acts constitute a combination or conspiracy in restraint of trade." *Grams,* 97 Wis.2d at 346, 294 N.W.2d 473 (citing cases). There is no reason that the effects-based logic of these federal cases should not then govern the question of which interstate transactions constitute unlawful activity under Chapter 133.[8]

In a recent decision addressing the correct burden of proof to be applied to private, civil antitrust actions under the chapter, the Wisconsin Supreme Court noted its assumption that "the legislature intended an interpretation that advances, not hinders, the purposes of the statute." *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,* 190 Wis.2d 650, 664, 529 N.W.2d 905 (1995). Ultimately, an adverse effects standard is the only standard that remains faithful to the purpose of Chapter 133—to protect and encourage competition in this state, by penalizing interstate activities that adversely affect it.

### 4. Application to Facts

■ E–One's claims based on Wisconsin antitrust law do not survive review upon defendants' motions to dismiss under an adverse effects standard. The factual allegations in the amended complaint concern transactions and conduct almost entirely interstate in nature. The state antitrust claims could nevertheless be cognizable under Chapter 133 if plaintiff alleged, as a result of this conduct, any significant adverse effects on trade and economic competition within Wisconsin. Plaintiff makes no such allegations.

E–One describes itself as a Delaware corporation with a principal place of business in Florida, and as a wholly-owned subsidiary of

---

8. In various guises, a handful of courts in other states have considered the scope of their own state antitrust law with respect to interstate trade. Many, but not all, have adopted what amounts to an effects-based standard. *See, e.g., Abbott Labs. v. Durrett,* —— So.2d —— 1998 WL 436062 (Ala. July 31, 1998) (limiting field of operation to purely intrastate transactions); *Heath Consultants, Inc. v. Precision Instruments, Inc.,* 247 Neb. 267, 527 N.W.2d 596, 606–07 (Neb.1995) (extensively quoting *Allied Chemical,* 9 Wis.2d 290, 101 N.W.2d 133); *C. Bennett Bldg. Supplies Inc. v. Jenn Air Corp.,* 759 S.W.2d 883,

889 (Mo.Ct.App.1988); *International Television Prods. Ltd. v. Twentieth Century–Fox Television Div.,* 622 F.Supp. 1532, 1540 (S.D.N.Y.1985); *Lynch Display Corp. v. National Souvenir Ctr. Inc.,* 640 S.W.2d 837, 840 (Tenn.Ct.App.1982) (using "predominance" standard but rejecting doctrine of mutual exclusivity); *R.E. Spriggs Co. v. Adolph Coors Co.,* 37 Cal.App.3d 653, 112 Cal.Rptr. 585, 593 (Cal.Ct.App.1974) (relying on "factual nexus" within state); *Commonwealth v. McHugh,* 326 Mass. 249, 93 N.E.2d 751 (Mass. 1950).

another Delaware corporation with a principal place of business in Illinois. Other than defendant Pierce, based in Appleton, plaintiff identifies no other allegedly injured OEM competitor with particular ties to Wisconsin. The defendant fire pump manufacturers, Waterous and Hale, have principal places of business in Minnesota, Alabama, Pennsylvania and Illinois but, again, no particular ties to Wisconsin.

Plaintiff claims that, because of Pierce's presence in Wisconsin, a significant amount of unlawful conspiratorial activity occurred in this state, adversely affecting a high volume of the ultimate sales across the country. (Opp'n Br. at 3.) This claim does not, however, amount to an allegation that sales or competition *within Wisconsin* were significantly and adversely affected. There may be situations in which the unlawful benefits accruing to a Wisconsin defendant, without further injury to a Wisconsin plaintiff, would sufficiently and negatively impact economic competition in Wisconsin to meet an adverse effects standard. Based on plaintiff's allegations, this does not appear to be such a situation.

Plaintiff claims that 3500 to 4000 fire trucks are purchased by fire departments in the United States each year. This figure presumably applies to all OEMs selling fire trucks in all states with all manner of midship mounted fire pumps. No further allegations narrow this number to fire trucks sold to Wisconsin purchasers, with prices artificially inflated by the alleged Waterous–Hale–Pierce fire pump conspiracy. Without this type of information, the amended complaint does not allege significant and adverse effects on fire truck sales in this state.

Indeed, the only significant and adverse effect alleged by plaintiff is to plaintiff itself. If the allegations are true, then E–One has been substantially injured by defendants' monopolistic practices. Based on the amended complaint, however, the connection between plaintiff's injury and Wisconsin commerce is tenuous at best. E–One identifies three Wisconsin dealerships of a number allegedly maintained by plaintiff over the years. The specific dates of operation suggest that only one dealership in Wisconsin was maintained by E–One at any given time, however. Plaintiff does not estimate the amount of

sales at such dealerships in a certain time frame or suggest what proportion of those sales were affected by defendants' conduct. Plaintiff does not indicate how many fire trucks are sold in Wisconsin per year, how many by plaintiff, or how many by plaintiff's competitors. Indeed, plaintiff does not identify a single fire truck contract in Wisconsin from which E–One was precluded from bidding based on the unavailability of Waterous pumps. Without this type of information, the amended complaint does not suggest that injury to E–One also constituted significant injury to trade and commerce related to fire truck sales in Wisconsin.

In sum, plaintiff's allegations are not cognizable under Wisconsin antitrust law, not because they depict predominantly interstate transactions, but because they do not allege significant and adverse effects on economic competition in Wisconsin. Because plaintiff has failed to state a claim under Chapter 133, plaintiff's claims under Wis. Stat. § 133.03 are dismissed.

### A. Claims Based on Wis. Stat. § 100.20

Plaintiff also includes state claims based on Wis. Stat. § 100.20, a section of the state chapter on marketing which establishes appropriate administrative responses to unfair trade practices. Section 100.20 allows the Department of Agriculture, Trade and Consumer Protection ("Department") to hold public hearings and then issue special orders prohibiting certain persons from engaging in certain methods of competition. Wis. Stat. § 100.20(3). The section also empowers the Department to investigate violations of such orders and to commence actions in circuit court enjoining such violations. Wis. Stat. § 100.20(6). The Department of Justice may also file a written complaint with the Department, alleging unfair trade practices under this section. Wis. Stat. § 100.20(4). However, no private cause of action exists under § 100.20, except for violation of an order issued by the Department under this section.

Any person suffering pecuniary loss because of a violation by any other person *of any order issued under this section* may sue for damages therefore in any court of competent jurisdiction and shall recover

twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee.

Wis. Stat. § 100.20(5) (emphasis added).

Plaintiff does not allege that any Department order prohibiting unfair trade practices has been entered against defendants, much less that defendants have violated such an order. Plaintiff argues that the above subsection only serves to limit double recovery to instances where an order has been entered and violated, but that § 100.20 as a whole should be construed to support a general private cause of action for unfair trade practices. There is no support for this novel reading of the statute in case law or in the structure of Chapter 100. Like Chapters 93 to 99 of the Wisconsin Statutes, Chapter 100 establishes the administrative role of the Department in one of several regulated areas of agriculture, trade and consumer protection—in this case marketing and trade practices. Regulatory enforcement in these chapters is almost exclusively the province of the Department. Under this scheme, a private cause of action must be clearly indicated by the legislature.

Chapter 100 betrays no suggestion that such a private right exists, absent a violation of a Departmental order. *See, e.g.* Wis. Stat. § 100.26 (on penalties); § 100.263 (on recovery for costs of investigation). When, as here, the legislature has enacted a comprehensive regulatory scheme, I must assume this scheme is exclusive. *See Hermann v. Town of Delavan,* 208 Wis.2d 216, 228, 560 N.W.2d 280 (1996). Plaintiff's claims under Wis. Stat. § 100.20 therefore fail to state a claim and are dismissed.

Based on the above analysis, **IT IS HEREBY ORDERED** that all three defendants' motions under Fed.R.Civ.P. 12(b)(6) to dismiss Counts X–XVIII of the amended complaint are **HEREBY GRANTED**, and these claims are **DISMISSED.**