Barbara A. Meyers, Lynn Stucker, Loyal Berg and Eugene Browning, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

Bayer AG, Bayer Corporation, Barr Laboratories, Inc., Rugby Group, Inc., Watson Pharmaceuticals, Inc. and Hoeschst Marion Roussel, Inc., Defendants-Respondents-Petitioners.

Supreme Court

*No. 2003AP2840. Oral argument December 12, 2006. —Decided July 13, 2007.*

2007 WI 99

(Also reported in 735 N.W.2d 448.)

For the defendants-respondents-petitioners there were briefs by *Phillip A. Proger, Kevin D. McDonald, Lawrence D. Rosenberg,* and *Jones Day,* Washington, D.C.; *Gerardo H. Gonzalez, Richard J. Krill,* and *Gonzalez, Saggio & Harlan, LLP,* Milwaukee; *Fred H.*

Bartlit, Jr., Peter B. Bensinger, Jr., Michael J. Valaik, Paul J. Skiermont, and *Bartlit Beck Herman Palenchar & Scott LLP,* Chicago, IL; *William J. Mulligan, Kathy L. Nusslock,* and *Davis & Kuelthau, S.C.,* Milwaukee; *Thomas D. Yannucci, P.C., Karen N. Walker, Edwin John U,* and *Kirkland & Ellis LLP,* Washington, D.C.; *Stephen P. Hurley, Kristine A. Long, Andrew W. Erlandson,* and *Hurley, Burish & Milliken, S.C.,* Madison; *David E. Everson, Heather S. Woodson, Victoria L. Smith,* and *Stinson Morrison Hecker LLP,* Kansas City, Mo., and oral argument by *Fred H. Bartlit, Jr.*

For the plaintiffs-appellants there was a brief by *John C. Cabaniss, Thomas Armstrong, Jr.,* and *von Briesen & Roper, S.C.,* Milwaukee, and oral argument by *Thomas Armstrong, Jr.*

An amicus curiae brief was filed by *Stephen E. Meili* and *Consumer Law Litigation Clinic,* Madison; *Peter C. Carstensen, David Dudley,* and *University of Wisconsin Law School,* Madison; on behalf of the University of Wisconsin Law School Consumer Law Litigation Clinic, Professor Peter C. Carstensen of the University of Wisconsin Law School, and David Dudley of the University of Wisconsin Law School.

An amicus curiae brief was filed by *Eric J. Wilson* and *Gwendolyn J. Cooley,* assistant attorneys general, with whom on the brief was Peggy A. Lautenschlager, attorney general, on behalf of the state of Wisconsin, and there was oral argument by *Eric J. Wilson.*

An amicus curiae brief was filed by *Paul E. Benson, Grant C. Killoran,* and *Michael Best & Friedrich, LLP,* Milwaukee, on behalf of the Milwaukee Metropolitan Chamber of Commerce and the Wisconsin Manufacturers and Commerce, Inc.

¶ 1. LOUIS B. BUTLER, JR., J. The defendants, Bayer AG, et al. (collectively "Bayer"), seek review of a published court of appeals' decision[1] reversing a circuit court order that dismissed all claims brought under Wisconsin's Antitrust Act, Chapter 133 of the Wisconsin Statutes, by Barbara Meyers, Lynn Stucker, Loyal Berg, and Eugene Browning (collectively "Meyers"), representing a putative class of Wisconsin residents who purchased the antibiotic ciprofloxacin hydrochloride from Bayer under the brand name Cipro. Meyers' complaint[2] alleges that Wisconsin consumers paid inflated prices for Cipro as a result of an unlawful agreement between Bayer and three manufacturers of generic drugs, Barr Laboratories, Inc. ("Barr"), Hoechst Marion Roussel, Inc. ("HMR") and The Rugby Group ("Rugby"), which precluded Barr, HMR and Rugby from selling or marketing generic ciprofloxacin hydrochloride to compete with Cipro.

¶ 2. The circuit court, Honorable Michael D. Guolee, dismissed Meyers' claims against Bayer, concluding that Wisconsin's Antitrust Act, Wis. Stat. § 133.03 (2005–06),[3] applied only to intrastate commerce. Meyers appealed, and the court of appeals held the case in abeyance pending our decision in *Olstad v. Microsoft Corp.*, 2005 WI 121, 284 Wis. 2d 224, 700 N.W.2d 139. Subsequently, we concluded in *Olstad* that Wisconsin's Antitrust Act applies to cases involving interstate conduct if

---

[1] *Meyers v. Bayer AG,* 2006 WI App 102, 293 Wis. 2d 770, 718 N.W.2d 251.

[2] Except where otherwise noted, the complaint we refer to throughout this opinion is the second amended complaint filed by the plaintiffs in this action.

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

(1) the actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside of Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.

*Olstad,* 284 Wis. 2d 224, ¶ 1. Applying *Olstad,* the court of appeals reversed the circuit court on grounds that the Wisconsin Antitrust Act reaches interstate commerce, and Meyers' complaint alleged facts of illegal conduct that, if true, "substantially affected" the people of Wisconsin and had impacts in this state. *Meyers v. Bayer AG,* 2006 WI App 102, ¶¶ 1, 10–11, 293 Wis. 2d 770, 718 N.W.2d 251.

¶ 3. We follow our precedent set forth in *Olstad* for determining when Chapter 133 reaches interstate commerce: A plaintiff filing an action under Wisconsin's Antitrust Act must allege price fixing as a result of the formation of a combination or conspiracy that " 'substantially affects' the people of Wisconsin and has impacts in this state" when the challenged conduct occurs predominately or exclusively outside this state. *Olstad,* 284 Wis. 2d 224, ¶ 85. We conclude that additional limitations Bayer and amici Milwaukee Metropolitan Chamber of Commerce and Wisconsin Manufacturers and Commerce seek to read into the "substantially affects" standard are unsupported by our precedents and are contrary to the policy choices of the legislature.

¶ 4. Meyers' 35–page, 106–paragraph complaint alleges a broad price-fixing scheme affecting "at a minimum, thousands . . . in Wisconsin" who purchased the best-selling antibiotic Cipro "at any time since

January 6, 1995." We conclude Meyers' complaint alleges illegal conduct that, if true, substantially affected the people of Wisconsin and had impacts in this state.[4] We therefore affirm the court of appeals' decision reversing the circuit court's order dismissing Meyers' claims, and remand for further proceedings consistent with this opinion.

## I

¶ 5. This review of a decision of the court of appeals arises on a motion to dismiss for failure to state a claim. For purposes of this review, we accept as true the facts alleged in Meyers' complaint. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 5, 270 Wis. 2d 146, 677 N.W.2d 233. The facts as set forth below are taken from Meyers' complaint except where otherwise noted.

¶ 6. Bayer filed U.S. Patent No. 4,670,444 (" '444 patent") on May 29, 1984, a compound patent for the

---

[4] At oral argument, the issue arose of whether the agreement between Bayer and the generic manufacturers constituted actionable conduct under Chapter 133. We note that a federal district court dismissed an action under the Sherman Antitrust Act against Bayer on grounds that the Agreement between Bayer and the generic manufacturers did not violate federal antitrust law. *See In re Ciproflaxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005). In a complex opinion discussing a number of different issues, the federal district court addressed whether the consumer plaintiffs could attack the validity of the Cipro patent post hoc, and the effect of the possible invalidity of the patent on the legality of the Agreements, among other questions. Because these issues have not been briefed by the parties, have not been developed in the record in this motion to dismiss, and are not properly before this court, we do not address them further. These matters may be addressed by the circuit court on remand.

drug ciprofloxacin hydrochloride. In October 1987, a subsidiary of Bayer obtained approval from the Food and Drug Administration ("FDA") to market ciprofloxacin hydrochloride. The drug was marketed under the name Cipro, a broad spectrum antibiotic approved to treat sinusitis, lower respiratory infections, and fifteen other ailments. Cipro quickly became one of the most prescribed drugs of its kind.[5] Meyers' complaint states that within one year of its introduction, Cipro was adopted in the formulary of every hospital in the United States.

¶ 7. In October 1991 Barr filed an Abbreviated New Drug Application ("application") with the FDA, pursuant to certain provisions of 21 U.S.C. § 355, a/k/a the Hatch-Waxman Act, requesting approval to market and sell generic ciprofloxacin hydrochloride ("generic Cipro"). Pursuant to the Hatch-Waxman Act, Barr notified Bayer of its application, and asserted that Bayer's '444 patent was invalid and unenforceable. In response, Bayer filed a patent infringement lawsuit against Barr on January 16, 1992, challenging Barr's application to market and sell generic Cipro. As a result of the infringement lawsuit, FDA approval of Barr's application was automatically postponed by operation of statute, 21 U.S.C. § 355(j)(5)(B)(iii) (1991), pending resolution of the patent infringement lawsuit.

¶ 8. On January 6, 1995, with the patent case as yet unresolved, the FDA gave tentative approval to Barr's application for generic Cipro. Meyers' complaint states that, following the FDA's action, a Barr official

---

[5] Meyers' complaint indicates that, as of January 2002, Cipro was the best-selling antibiotic in the world, a position it had maintained for eight consecutive years. Meyers cites a March 2000 Bayer press release indicating that in 1999 Cipro posted $1 billion in sales in the United States.

reportedly stated that Barr would bring to market its generic Cipro "immediately" if Barr prevailed in the patent infringement suit.

¶ 9. On March 29, 1996, Barr entered into an agreement with Rugby, a rival generic drug manufacturer, in which Barr agreed to share equally with Rugby any rights and profits from the eventual marketing and distribution of generic Cipro in exchange for Rugby's assistance in funding the patent litigation with Bayer.

¶ 10. Bayer moved for summary judgment in the patent suit with Barr and Rugby in January 1996. On June 5, 1996, the court presiding over the patent litigation denied Bayer's motion for summary judgment, and denied a motion for reconsideration on September 5, 1996.

¶ 11. On January 8, 1997, Bayer, Barr, HMR, and Rugby entered into four agreements (collectively, the "Agreement") which allocated the entire United States market for Cipro for at least six years, and required Bayer to make large monetary payments to Barr and HMR.[6] According to the complaint, Bayer made an initial payment to Barr and HMR of $49.1 million. The complaint asserts that the Agreement granted Bayer an unlawful monopoly in the market for Cipro and generic Cipro. As a part of the Agreement, Bayer and Barr agreed to resolve the patent litigation by entering into a consent judgment that acknowledged the validity and enforceability of the '444 patent. Bayer states it is undisputed that the discussions relating to the Agreement occurred in New York and Germany.

---

[6] The complaint states that Rugby was a subsidiary of HMR until February 1998, at which time Rugby was acquired by Watson. The complaint states that Rugby retained the exclusive right to distribute generic Cipro following the sale of Rugby to Watson Pharmaceuticals, Inc. ("Watson").

¶ 12. The Agreement further provided that Bayer could either (a) license and supply Bayer-manufactured Cipro to Barr and HMR for resale under a generic label; or (b) pay quarterly amounts to Barr from 1998 through at least 2003.[7] The former of these options established the price Barr and HMR would pay to Bayer for Cipro, and required Barr and HMR to share its profits with Bayer. The Agreement also required Barr to amend its application to the FDA, ending its challenge to the validity of the '444 patent. The Agreement required that the parties not disclose the terms of the Agreement. The consent judgment ending the patent litigation in federal court contained no information about the terms of the Agreement and made no mention of any payments from Bayer to Barr.

¶ 13. Meyers' complaint asserts that, as a result of the Agreement, Bayer maintained its monopoly of the United States market for Cipro and generic equivalents of Cipro. Published reports cited in the complaint show that from January 1997 to December 1998, Bayer increased the price of Cipro by 16.7%, one of the largest increases for any prescription drug in the United States. Bayer's internal sales documents show that its revenues and profits increased substantially after the execution of the Agreement, according to the complaint. From 1998 to 1999, Bayer's United States revenues from Cipro went up from $834,620,400 to $1,042,473,100, an increase of 25%, while its net profits jumped from $756,265,800 to $921,631,900, an increase of 22%.

---

[7] Meyers' brief states that Bayer has chosen to make quarterly payments to Barr and HMR. It states that, including the $49.1 million initial payment, Bayer agreed to pay Barr and HMR through December 2003 a total of $398 million not to compete in the United States with Bayer in the market for Cipro and generic equivalents to Cipro.

¶ 14. The complaint asserts that were it not for the conduct of the defendants, generic manufacturers, including Barr, would have begun marketing and selling generic Cipro in the United States no later than January 1995. The complaint asserts that, "[a]s a result of the illegal conduct of Defendants, Plaintiffs and members of the Class were compelled to pay, and did pay, supracompetitive prices for Cipro which were substantially higher than the prices that Plaintiffs and members of the Class would have paid absent the unlawful agreements and conspiracy alleged herein."

¶ 15. In November 2000, Meyers,[8] both individually and on behalf of all others similarly situated, filed suit against Bayer, Barr, Rugby, Watson and HMR in Milwaukee County Circuit Court. The complaint states that the named plaintiffs and members of the putative class are Wisconsin residents who purchased Cipro indirectly from Bayer at any time since January 6, 1995. The complaint alleges violations of the Wisconsin Unfair Competition statute, Wis. Stat. § 100.20(1), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1).

¶ 16. The case was removed to the United States District Court for the Eastern District of Wisconsin and subsequently transferred to a New York federal district court. On October 1, 2001, the case was remanded back to the state court where it was originally filed. *See In re Ciproflaxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 742–43 (E.D.N.Y. 2001).

¶ 17. On remand of the matter back to the Milwaukee Circuit Court, Bayer moved to dismiss Meyers' complaint. In an order dated September 19, 2003, the Milwaukee County Circuit Court, Honorable Michael D.

---

[8] Plaintiffs Stucker, Berg and Browning were later added to the complaint by amendment.

Guolee, granted Bayer's motion, concluding that the complaint failed to state a claim on which relief could be granted. The circuit court's decision relied on *Conley Publishing Group, Ltd. v. Journal Communications, Inc.,* 2003 WI 119, ¶ 16, 265 Wis. 2d 128, 665 N.W.2d 879, which stated that "the scope of Chapter 133 is limited to intrastate transactions."

¶ 18. Meyers appealed from the order of dismissal. The court of appeals stayed the appeal pending the outcome of the *Olstad* case, which was on certification to this court to resolve an apparent conflict between a line of cases including *Conley Publishing,* which held that Chapter 133 did not reach interstate commerce, and a divergent line of cases, including *State v. Allied Chemical and Dye Corp.,* 9 Wis. 2d 290, 295, 101 N.W.2d 133 (1960), which suggested that Chapter 133 provided a remedy in at least some cases involving interstate conduct. In a 5–0 decision, with Chief Justice Abrahamson and Justice Bradley not participating, we wrote that Chapter 133 "applies to interstate commerce, at least in some circumstances." *Olstad,* 284 Wis. 2d 224, ¶ 74. We explained that Wisconsin's Antitrust Act provides a remedy whenever: (1) the actionable conduct occurs within the state; or (2) the actionable conduct "substantially affects" the people of Wisconsin and has impacts in the state, even if the conduct resulting in these impacts occurred outside of Wisconsin. *Id.,* ¶ 85.

¶ 19. In view of *Olstad,* the court of appeals reversed the circuit court, concluding that the circuit court's interpretation of the scope of the Wisconsin Antitrust Act was erroneous. *Meyers,* 293 Wis. 2d 770, 9. The court of appeals noted that while *Olstad* did not define substantially affects, this court stated in *Allied Chemical,* 9 Wis. 2d at 295, that [t]he public interest

and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy." The court of appeals examined Meyers' complaint and concluded that it set forth the necessary facts and allegations to withstand a motion to dismiss. *Meyers,* 293 Wis. 2d 770, ¶ 13.

¶ 20. Bayer filed a petition seeking review of the court of appeals' decision, stating that the issue presented for review was whether the allegations of the complaint satisfied the "substantially affects" test articulated in *Olstad.* We granted Bayer's petition to address this particular issue, and we affirm.

II

¶ 21. The matter of whether a complaint states a claim upon which relief can be granted is a question of law subject to our independent review. *Beloit Liquidating Trust v. Grade,* 2004 WI 39, ¶ 17, 270 Wis. 2d 356, 677 N.W.2d 298 (citation omitted). "A motion to dismiss a complaint for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint." *Id.* For the limited purposes of assessing the complaint's legal sufficiency, we accept as true all facts as set forth in the complaint, and reasonable inferences that may be drawn from such facts. *Id.* "[A] complaint in a civil action should not be dismissed as legally insufficient unless it is clear that there are no circumstances under which the plaintiff can recover." *Lewis v. Sullivan,* 188 Wis. 2d 157, 164, 524 N.W.2d 630 (1994).

¶ 22. Whether the complaint is legally sufficient in this case depends upon application of the Wisconsin Antitrust Act, Chapter 133, and the cases construing it,

to the facts as pled. Interpretation and application of statutes and case law to a set of facts are matters of law that we decide de novo. *Welin v. American Family Mut. Ins. Co.,* 2006 WI 81, ¶ 16, 292 Wis. 2d 73, 717 N.W.2d 690.

¶ 23. Statutory interpretation begins with the language of the statute. We apply the language of the statute as written, giving the words their commonly accepted meanings. Statutory context is relevant to the plain meaning of a statute. Previous cases construing a statute also become a part of our understanding of a statute's plain meaning. *See Olstad,* 284 Wis. 2d 224, ¶ 21 (quoting *Zimmerman v. Wisconsin Elec. Power Co.,* 38 Wis. 2d 626, 633–34, 157 N.W.2d 648 (1968) (" 'It has often been said that once a construction has been given to a statute, the construction becomes a part of the statute.' ")).

III

¶ 24. Two years ago, we concluded in *Olstad,* 284 Wis. 2d 224, ¶ 1, that the Wisconsin Antitrust Act, Wis. Stat. § 133.03,

> may reach interstate commerce if (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.

A civil plaintiff filing an action under the act must allege either that actionable conduct occurred within the state, or that the conduct complained of "substan-

tially affects" the people of Wisconsin and has impacts in this state. *Id.,* ¶ 85. Because the issue in *Olstad* arose on a certified question, we did not apply the "substantially affects" test to the facts of the case, a class action against the software manufacturer Microsoft alleging monopolistic practices. *See id.* We explicitly declined to elaborate on the meaning of "substantially affects," except to state the following: "Operating with lesser standards would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts." *Id.*

¶ 25. Bayer contends that the cases upon which *Olstad* relied establish that the "substantially affects" test requires that plaintiffs allege specific and particularized effects on Wisconsin consumers, not merely generalized allegations of nationwide effects. It further asserts that plaintiffs must allege that the impacts on this state are more than that indirect purchasers in Wisconsin may have paid higher prices because of the challenged conduct. Meyers contends that requiring allegations of specific and particularized effects would amount to a heightened pleading standard for claims brought under the Wisconsin Antitrust Act, and be contrary to the purposes of the statute. To consider these arguments, we examine the language of the Wisconsin Antitrust Act and those cases interpreting it.

A

¶ 26. Wisconsin Stat. § 133.03 provides as follows, in relevant part:

> (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. Every person who makes any contract

or engages in any combination or conspiracy in restraint of trade or commerce is guilty of a Class H felony, except that, notwithstanding the maximum fine specified in s. 939.50(3)(h), the person may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000.

(2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce is guilty of a Class H felony, except that, notwithstanding the maximum fine specified in s. 939.50(3)(h), the person may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000.

Chapter 133 contains a statement of legislative intent, which provides as follows:

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

Wis. Stat. § 133.01. Wisconsin Stat. § 133.18 provides treble damages to "any person injured, directly or indirectly." As we noted in *Olstad,* 284 Wis. 2d 224, ¶ 61, language providing recovery to those harmed indirectly was adopted in response to the United States

Supreme Court's decision in *Illinois Brick Co. v. State of Illinois,* 431 U.S. 720 (1977), which limited recovery under the federal antitrust statute to direct purchasers.

¶ 27. We thoroughly examined the language of the Wisconsin Antitrust Act, its legislative history and historical context in *Olstad* to determine whether the Wisconsin Antitrust Act applies to conduct that reaches interstate commerce. There, we noted that the Wisconsin Antitrust Act was adopted in 1893, three years after passage of the Sherman Antitrust Act. *Olstad,* 284 Wis. 2d 224, ¶ 41. At that time, there was little doubt that state antitrust law was limited in scope to conduct impacting intrastate commerce; the Supreme Court saw only a narrow role for state government in commercial regulation. *Id.,* ¶ 30. Courts then treated state and federal governments as " 'separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres.' " *Id.,* ¶ 33 (quoting *The Collector v. Day,* 78 U.S. 113, 124 (1870)).

¶ 28. Our early cases interpreting the reach of the Wisconsin Antitrust Act were consistent with this narrow view of state regulatory authority, holding that the statute applied only to intrastate commerce. *See, e.g., State v. Lewis & Leidersdorf Co.,* 201 Wis. 543, 549, 230 N.W. 692 (1930); *Pulp Wood v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914). While the Supreme Court later adopted a much less rigid view of the role of state government in regulation, some of this court's decisions continued to adhere to the view that the Wisconsin Antitrust Act was limited in scope to intrastate commerce. *See, e.g., Conley Publishing,* 265 Wis. 2d 128; *Grams v. Boss,* 97 Wis. 2d 332, 346, 294 N.W.2d 473 (1980). However, as we discussed in *Olstad,* 284 Wis. 2d 224, ¶¶ 24–27, other cases held that the Wisconsin Antitrust Act reached interstate commerce

in some circumstances. *See State v. Milwaukee Braves,* 31 Wis. 2d 699, 144 N.W.2d 1 (1966); *Allied Chemical,* 9 Wis. 2d 290. Based on the apparent conflict between these lines of cases, we concluded in *Olstad,* 284 Wis. 2d 224, ¶ 28, that Chapter 133 had been interpreted inconsistently, and, as a result, the statute was ambiguous.[9] We therefore examined the legislative history of the Wisconsin Antitrust Act, and in particular a 1980 overhaul of the statute. *See id.,* ¶¶ 55–73.

¶ 29. The 1980 revision, *Olstad* explained, included language that permitted indirect purchasers harmed by antitrust violations to recover under the Wisconsin Antitrust Act. *Id.,* ¶ 61–63 (discussing language now contained in Wis. Stat. § 133.18 providing that "any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue"). A letter from Attorney General Bronson La Follette to the bill's Assembly author, Representative Marjorie Miller, indicated that this change

> would reverse the effect of the U.S. Supreme Court's ruling in the *Illinois Brick* case on Wisconsin law. The Court, in that case, ruled that only direct purchasers may recover damages for illegally-priced goods. Thus, indirect purchasers—such as state and local governments which purchase most of their supplies through wholesalers, retailers or other middlemen—are left out

---

[9] The conclusion in *Olstad v. Microsoft Corp.,* 2005 WI 121, ¶ 28, 284 Wis. 2d 224, 700 N.W.2d 139, that the statute was ambiguous was not based on a reading of the text of the statute itself, but on the inconsistency in prior case law construing the statute. In determining the statute to be ambiguous, *Olstad* observed that while "[t]he language [of Wis. Stat. § 133.03] itself provides no express limit to the statute's scope," this court had ascribed such a limit to the statute only two years earlier in *Conley Publishing Group, Ltd. v. Journal Communications, Inc.,* 2003 WI 119, ¶ 16, 265 Wis. 2d 128, 665 N.W.2d 879.

in the cold when it comes to recovering for the illegally inflated prices they and their constituents must pay.

*Id.,* ¶ 62 (quoting Letter to Representative Marjorie Miller from Attorney General Bronson La Follette dated October 3, 1979, located in Legislative Council files, Madison, Wisconsin). We note that Meyers and the putative class were indirect purchasers of Cipro, and that without this change they would not have had a cause of action under the Wisconsin Antitrust Act.

¶ 30. Moreover, we noted in *Olstad* that the 1980 revision created a new section, Wis. Stat. § 133.01, that included a broad statement of legislative intent. *Id.,* ¶ 68. This section provided, in part: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." *Id.*

¶ 31. We concluded in *Olstad* that these changes (along with other legislative history material) "le[ft] little doubt of the legislature's intent to apply the Wisconsin antitrust statute to interstate commerce." *Id.,* ¶ 55. We then held that when the challenged conduct does not occur within the state of Wisconsin and impacts interstate commerce, the Wisconsin Antitrust Act applies if the conduct "substantially affects" the people of Wisconsin and has "impacts"[10] in this state. *Id.,* ¶ 85. The "substantially affects" standard

[10] The term "impacts" was not defined or described in detail by the court in *Olstad. See* 284 Wis. 2d 224, ¶ 85. The *Olstad* decision cites as its authority for the use of this term the "substantially affects" standard discussed in *State v. Allied Chemical and Dye Corp.,* 9 Wis. 2d 290, 295, 101 N.W.2d 133 (1960). We construe this language in *Olstad* (that the Wisconsin Antitrust Act applies if the "conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts

313

comes from the following language in the *Allied Chemical* decision: "The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy." *Allied Chemical,* 9 Wis. 2d at 295.

¶ 32. Bayer contends that the cases upon which *Olstad* relied establish two limiting principles that should govern the application of the "substantially affects" test. First, Bayer argues plaintiffs must allege specific and particularized effects on Wisconsin consumers, not merely generalized allegations of nationwide effects, citing *Emergency One, Inc. v. Waterous Co.,* 23 F. Supp. 2d 959 (E.D. Wis. 1998), and *State v. Milwaukee Braves, Inc.,* 31 Wis. 2d 699, 144 N.W.2d 1 (1966). Second, Bayer argues plaintiffs must put forth allegations more specific than merely that some Wisconsin downstream consumers may have generally paid higher prices because of the challenged conduct, citing *Emergency One.* We examine the cases on which we relied in *Olstad*—*Allied Chemical, Milwaukee Braves* and *Emergency One*—to determine whether they support Bayer's argument.

B

¶ 33. The *Allied Chemical* case arose out of an action alleging monopolistic practices in violation of the Wisconsin Antitrust Act brought by the attorney general against manufacturers and sellers of the chemical calcium chloride. At the time of the state suit, the

occurred predominantly or exclusively outside this state") as merely providing further clarification of the "substantially affects" test discussed in *Allied Chemical,* as opposed to altering that test.

314

Federal Trade Commission (FTC) was already investigating allegations of price-fixing against the calcium chloride companies, and the trial court dismissed the complaint on grounds that the federal regulatory agency had taken exclusive jurisdiction over the matter. *Allied Chemical,* 9 Wis. 2d at 293.

¶ 34. This court reversed the trial court's dismissal, concluding that federal antitrust law did not preempt state efforts to enact and enforce effective legislation against monopolistic practices. *Id.* at 295. The court further concluded that there was no conflict between the federal and state statutes, that the Wisconsin statutes made no attempt to regulate or burden interstate commerce, and that the FTC was not established to enforce the federal antimonopoly statutes but to regulate certain trade practices instead. Moreover, the court cited letters in the record from FTC officials and the Department of Justice that indicated that the attitude of the federal government was to cooperate with the state in its efforts to enforce state statutes dealing with conspiracies and monopolies. *Id.* at 295–96. Importantly, the *Allied Chemical* court held that the Wisconsin antitrust statute was enacted to protect state consumers from the effects of monopolistic practices. *Id.*

¶ 35. In *Milwaukee Braves,* the State brought an action under the Wisconsin Antitrust Act in response to the departure from Wisconsin of the Milwaukee Braves professional baseball club. Although the *Milwaukee Braves* court declined to enforce Chapter 133, in part because of major league baseball's well-settled exemption from antitrust regulation, all seven members of the court asserted that the Wisconsin Antitrust Act could be applied to interstate commerce. *Olstad,* 284 Wis. 2d 224, ¶ 27 (discussing *Milwaukee Braves,* 31 Wis. 2d at

725). The *Milwaukee Braves* court noted that the exercise of the defendants' monopoly power caused "substantial injury to business activity within Wisconsin" such that the court would "assume, at this point, that a violation of Wisconsin law has occurred if our law can be applied." *Milwaukee Braves,* 31 Wis. 2d at 719. Nevertheless, the court recognized that while "[t]he state may, ordinarily, protect the interests of its people by enforcing its antitrust act against persons doing business in interstate commerce," the state policy must yield when a conflict exists between state and federal policy. *Id.* at 721.

¶ 36. In *Emergency One,* a Wisconsin federal district court considered the issue of whether the Wisconsin Antitrust Act reaches interstate commerce several years before our decision in *Olstad.* Emergency One, a Florida-based manufacturer of fire trucks, sued a Wisconsin truck manufacturer and two manufacturers of fire pump hoses, alleging the three companies conspired to choke competition in the United States market for fire pumps, in violation of Wisconsin's Antitrust Act. The *Emergency One* court carefully examined our precedents and the legislative history of Wis. Stat. § 133.03 and concluded that the Wisconsin Antitrust Act reaches interstate commerce to some degree. *Emergency One,* 23 F. Supp. 2d at 966.

¶ 37. To determine when the statute would apply in cases involving interstate commerce, the *Emergency One* court relied on an "adverse effects" standard that is, in essence, the test we adopted in *Olstad. Emergency One,* 23 F. Supp. 2d at 969–970. The *Emergency One* court explained that the "adverse effects" test "extend[s] the jurisdictional scope of Wisconsin antitrust law to unlawful activity which has significantly and adversely affected trade and economic competition within this

316

state." *Id.* at 969. In examining and ultimately rejecting other approaches to determine when the antitrust act applies in cases involving interstate commerce,[11] the *Emergency One* court concluded that "an adverse effects standard is the only standard that remains faithful to the purpose of Chapter 133—to protect and encourage competition in this state, by penalizing interstate activities that adversely affect it." *Id.* at 970.

¶ 38. Applying this effects-based standard, the *Emergency One* court concluded that the complaint "d[id] not allege significant and adverse effects on economic competition in Wisconsin." *Id.* at 971.

> Based on the amended complaint . . . the connection between plaintiff's injury and Wisconsin commerce is

---

[11] The *Emergency One* court considered two alternate tests for determining whether state antitrust law applies in cases involving interstate commerce: (1) A "contacts-based" standard that emphasizes "the nature and degree of defendant's contacts with Wisconsin" bearing similarities to the *International Shoe Co. v. Washington,* 326 U.S. 310 (1945), test in the law of personal jurisdiction, and the "aggregation of contacts" standard set forth in *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 308 (1981), to resolve "choice of law" disputes; and (2) A "predominance" standard, which would apply state antitrust law only to transactions and commerce that is predominantly intrastate in nature. *Emergency One v. Waterous Co., Inc.,* 23 F. Supp. 2d 959, 967–969 (E.D. Wis. 1998). The federal district court rejected the "contacts-based" standard because, in cases involving nationwide sales, application of a "contacts-based" standard might result in application of state antitrust law when no significant injury to trade and economic competition occurred in the state. The court rejected the "predominance" standard on grounds that it would essentially reintroduce federal preemption of state anti-trust law (commerce cannot be both predominantly interstate and predominantly intrastate in nature) "a result consistently rejected by the Supreme Court." *See Emergency One,* 23 F. Supp. 2d at 967 (citing *California v. ARC America Corp.,* 490 U.S. 93, 102 (1989)).

tenuous at best. E-One identifies three Wisconsin dealerships of a number allegedly maintained by plaintiff over the years. The specific dates of operation suggest that only one dealership in Wisconsin was maintained by E-One at any given time, however. Plaintiff does not estimate the amount of sales at such dealerships in a certain time frame or suggest what proportion of those sales were affected by defendants' conduct. Plaintiff does not indicate how many fire trucks are sold in Wisconsin per year, how many by plaintiff, or how many by plaintiff's competitors. Indeed, plaintiff does not identify a single fire truck contract in Wisconsin from which E-One was precluded from bidding based on the unavailability of Waterous pumps. Without this type of information, the amended complaint does not suggest that injury to E-One also constituted significant injury to trade and commerce related to fire truck sales in Wisconsin.

*Id.* The court concluded: "[T]he only significant and adverse effect alleged by plaintiff is to plaintiff itself." *Id.*

¶ 39. Relying on the above cases, Bayer makes essentially three arguments. First, Bayer asserts that all of these cases stand for the proposition that plaintiffs bringing suit under the Wisconsin Antitrust Act must specifically allege the challenged conduct had Wisconsin impacts. Second, citing language from *Milwaukee Braves* noting that the departure of the Braves from the state "terminated very substantial business activity in Wisconsin," Bayer suggests that the plaintiffs must also allege that these Wisconsin impacts were disproportionate to nationwide impacts. Third, Bayer asserts that the analysis of the *Emergency One* court demonstrates that "bare allegations" that indirect purchasers in Wisconsin paid higher prices as a result of

the challenged conduct is not sufficient to meet the "substantially affects" standard. We consider each of these arguments in turn.

¶ 40. Bayer is correct that a plaintiff must allege that the conduct complained of has impacts in Wisconsin, and not merely nationwide impacts. *Olstad,* 284 Wis. 2d 224, ¶ 85. The cases demonstrate that the focus of the "substantially affects" standard is properly on Wisconsin, and the sufficiency of the plaintiff's claim depends on whether the complaint alleges that the conduct "substantially affects" the people of Wisconsin. However, when determining on a motion to dismiss whether a complaint under the Wisconsin Antitrust Act alleges that the challenged conduct "substantially affected" the people of Wisconsin, courts apply, as on any motion to dismiss, Wisconsin's notice pleading statute, Wis. Stat. § 802.02(1)(a).

¶ 41. "For well over 100 years, this court has consistently held that pleadings shall be liberally construed with a view to substantial justice between the parties." *J.L. Phillips & Assoc. v. E&H Plastic Corp.,* 217 Wis. 2d 348, 365, 577 N.W.2d 13 (1998) (citation omitted). "[A] complaint in a civil action should not be dismissed as legally insufficient unless it is clear that there are no circumstances under which the plaintiff can recover." *Lewis,* 188 Wis. 2d at 164.

¶ 42. There is no exception to this rule for actions under the Wisconsin Antitrust Act. In *Grams,* 97 Wis. 2d 332, an insurance agency brought suit against another insurance company and a hospital service corporation, alleging antitrust violations. Writing for the majority, Justice Abrahamson concluded that while the plaintiffs' complaint was "barebone . . . conclusory in part, and may have failed to state sufficient facts" under

prior pleading rules, it was sufficient to state a claim under the notice pleading statute. *Id.* at 352.

¶ 43. In light of our liberal pleadings standard, a complaint under the Wisconsin Antitrust Act, where the circumstances involve interstate commerce and the challenged conduct occurred outside of Wisconsin, is sufficient if it alleges price fixing as a result of the formation of a combination or conspiracy that substantially affected the people of Wisconsin and had impacts in this state. As Meyers asserts, requiring greater specificity than the notice pleading statute demands would create a heightened pleading standard for Chapter 133 actions that would bar otherwise legitimate suits, thus undermining the Act's purposes of fostering competition and prohibiting unfair and discriminatory business practices. *See* Wis. Stat. § 133.01.

¶ 44. We decline to follow Bayer's suggestion that the impacts of the challenged conduct on Wisconsin must be distinguishable from or disproportionate to its impacts on other states. Under *Olstad,* the complaint must simply allege that the challenged conduct " 'substantially affects' the people of Wisconsin and has impacts in this state," not that these impacts be disproportionately felt in Wisconsin. *Olstad,* 284 Wis. 2d 224, ¶ 85.

¶ 45. Bayer apparently takes the fact that the *Emergency One* and *Milwaukee Braves* courts focused (properly) on the impacts felt in Wisconsin to mean that plaintiffs filing an action under Chapter 133 must assert allegations of disproportionate impacts on Wisconsin. As the Department of Justice asserts in its amicus brief, this approach would subject a defendant that targets the effects of its illegal conduct on Wisconsin to treble damages under Chapter 133, while another

defendant that causes equal or greater harm in Wisconsin would be immune from suit simply because the latter defendant's harms were evenly spread across the country. Neither the statute nor our case law requires that plaintiffs allege that the challenged conduct caused disproportionate injury to Wisconsin consumers. Plaintiffs need only allege that the conduct substantially affected the people of Wisconsin and had impacts in this state. *Olstad,* 284 Wis. 2d 224, ¶ 85.

¶ 46. Turning to Bayer's contention that the "substantially affects" standard requires more than "bare allegations" that indirect purchasers in Wisconsin paid higher prices as a result of the challenged conduct, we disagree. This argument is based on a misreading of *Emergency One* and, moreover, is plainly contrary to Wis. Stat. §§ 133.03 and 133.18.

¶ 47. Bayer contends that the *Emergency One* court held that the plaintiff's allegations of supracompetitive prices were not sufficient to state a claim under the Wisconsin Antitrust Act. This misstates the holding of *Emergency One.* The *Emergency One* court dismissed the plaintiff's claim because it concluded that the plaintiff's complaint "made no . . . allegations" of "any significant adverse effects on trade and economic competition within Wisconsin." *Emergency One,* 23 F. Supp. 2d at 970. The *Emergency One* court carefully examined the complaint to ascertain whether it alleged "significant adverse effects" to support a claim under state antitrust law. *Id.* at 970–71. Based on this examination, the court concluded that the plaintiff failed to state a claim under the Wisconsin Antitrust Act. *Id.* It did not dismiss the complaint based on a per se rule that "bare allegations" that indirect purchasers in Wisconsin paid higher prices is insufficient to state a claim under the act.

¶ 48. The Wisconsin Antitrust Act specifically provides a remedy for indirect purchasers who suffer harm as a result of conduct that violates Chapter 133. *See* Wis. Stat. § 133.18 ("[A] person injured, directly *or indirectly,* by reason of anything prohibited by this chapter may sue . . . and shall recover . . . damages.") (emphasis added). In *Olstad,* we noted that the 1980 revision of Chapter 133 provided a remedy under the statute to indirect purchasers in response to *Illinois Brick,* 431 U.S. 720, which foreclosed recovery to indirect purchasers under the federal statute. An allegation that thousands of Wisconsin consumers paid supracompetitive prices as a result of monopolistic conduct by an interstate seller therefore states a basis for recovery under the statute.

¶ 49. The test we crafted in *Olstad* for determining when, in circumstances involving interstate commerce where the challenged conduct occurred outside of Wisconsin, a complaint states a claim under the Wisconsin Antitrust Act was derived in part from this court's decision in *Allied Chemical,* 9 Wis. 2d 290. Like the present case, *Allied Chemical* involved allegations of a conspiracy to fix prices to the detriment of Wisconsin consumers. This court held in *Allied Chemical* that price-fixing is a monopolistic practice that, by its very nature, substantially affects the public.

> The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy. The people of Wisconsin are entitled to the advantages that flow from free competition in the purchase of calcium chloride and other products, and if the state is able to prove the allegations made in its complaint it is apparent that the acts of the defendants deny to them those advantages.

*Id.* at 295.

¶ 50. Amici Wisconsin Manufacturers and Commerce (WMC) and Milwaukee Metropolitan Area Chamber of Commerce (MMAC) point us to *Szukalski v. Crompton Corp.*, 2006 WI App 195, 296 Wis. 2d 728, 726 N.W.2d 304. There, the court of appeals affirmed a circuit court dismissal of an antitrust lawsuit brought by a group of tire buyers alleging several companies engaged in the manufacture and sale of chemicals used to process rubber conspired to fix prices. In determining the scope of the "substantially affects" test, the *Szukalski* court held that plaintiffs must allege "(1) specific effects on Wisconsin commerce, not merely effects that are nationwide, and (2) that these effects on Wisconsin are more than a general nationwide effect on the price," citing *Emergency One*, 23 F. Supp 2d at 971, and a recent decision of the Tennessee Supreme Court, *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512 (Tenn. 2005). *Szukalski*, 726 N.W.2d 304, ¶ 20. While noting that *Szukalski* is not before us, we address it to resolve any inconsistencies between it and our decision today.

¶ 51. *Szukalski* correctly states that a complaint must allege effects on Wisconsin, and not merely nationwide effects.[12] However, its conclusion that the "substantially affects" standard requires allegations "that these effects on Wisconsin are more than a general nationwide effect on the price" misstates the *Olstad*

---

[12] Because *Szukalski v. Crompton Corp.*, 2006 WI App 195, 296 Wis. 2d 728, 726 N.W.2d 304, no petition for review filed, is not before us, and we have not had an opportunity to review the plaintiff's complaint in *Szukalski* to determine its sufficiency, we do not address the *Szukalski* court's conclusion that the plaintiff failed to allege substantial Wisconsin effects.

standard, and is inconsistent with our opinion today. *See supra,* ¶¶ 45–46. As noted, plaintiffs need not allege that the challenged conduct disproportionately affected Wisconsin, only that the challenged conduct substantially affected the people of Wisconsin and had impacts in this state. *Olstad,* 284 Wis. 2d 224, ¶ 85.

¶ 52. Finally, Bayer and amici WMC and MMAC contend that certain limitations on actions under the Wisconsin Antitrust Act are necessary for judicial economy and preserving a favorable business climate in Wisconsin. They assert that if the court does not adopt their proposed limitations to the "substantially affects" test, Wisconsin courts will be flooded with complex antitrust litigation. They maintain that without these limitations the specter of antitrust litigation would create a hostile atmosphere for businesses in Wisconsin.

¶ 53. To adopt on policy grounds the limitations Bayer and amici propose would be to substitute our own judgment for that of the legislature. By establishing a broad antitrust act that provides remedies to consumers not available under federal antitrust law, the legislature has made clear policy choices in the area of antitrust regulation. The "substantially affects" test adopted in *Olstad* is consistent with the legislature's policy choices; requiring more of plaintiffs would close off consumer suits, particularly those by indirect purchasers, contrary to the 1980 revision of the statute. Moreover, it would bar otherwise legitimate actions, thereby undermining the statute's purpose "to foster and encourage competition by prohibiting unfair and discriminatory practices which destroy or hamper competition." *See* Wis. Stat. § 133.01. We decline to substitute our judgment for that of the legislature. *See Flynn v. Dep't of Admin.,* 216 Wis. 2d 521, 539, 576 N.W.2d 245

(1998) ("This court has long held that it is the province of the legislature, not the courts, to determine public policy.").[13]

## C

¶ 54. We turn now to Meyers' complaint to determine if it alleges that the conduct of Bayer and the generic manufacturers substantially affected the people of Wisconsin and had impacts in this state.

¶ 55. Meyers' complaint alleges, in the course of 35 pages and 106 paragraphs, a broad price-fixing scheme affecting "at a minimum, thousands . . . in Wisconsin." The complaint states that the named plaintiffs and the putative class are Wisconsin residents who purchased the antibiotic Cipro "at any time since January 6, 1995," the date that Meyers alleges the market for Cipro and generic equivalents would have opened to competition. The complaint states that Cipro was the best-selling antibiotic in the world throughout most of the 1990s. It avers that Bayer posted $1 billion in sales of Cipro in the United States in 1999 alone. It states that as a result of the Agreement among Bayer and the generic manufacturers, Bayer maintained its monopoly in the United States market for Cipro; that from January 1997 to December 1998, Bayer increased its price for Cipro by 16.7%; and that from 1998 to 1999, Bayer's United States revenues for Cipro increased 25%, while its net profits increased 22%.

¶ 56. While Meyers' complaint alleges harm to "thousands of Wisconsin residents," the *Emergency One* complaint, by contrast, alleged a conspiracy adversely

---

[13] As to the merits of these policy arguments, we note that Bayer and amici fail to provide empirical support for the proposition that failure to limit the applicability of the Wisconsin Antitrust Act would harm Wisconsin's business climate.

affecting "only . . . plaintiff itself." *Emergency One,* 23 F. Supp. 2d at 971. The plaintiff in *Emergency One* was a fire truck manufacturer that apparently maintained only one dealership in Wisconsin. *Id.* at 960–61. The plaintiff's complaint did not state the number of sales it made in Wisconsin per year, although it certainly would have had this information.[14] *Id.* at 971. The plaintiff did not indicate a time frame in which the people of Wisconsin suffered injury as a result of alleged monopolistic practices. *Id.* And the company itself was a Delaware corporation, with a principal place of business in Florida, and thus, any injury suffered by the company resulting in lay-offs or lost profits would have likely had a negligible effect on Wisconsin workers and investors. *Id.* at 970–71.

¶ 57. Here, Meyers alleges "thousands of Wisconsin residents" suffered economic harm as a result of Bayer's alleged monopolistic practices, starting January 6, 1995. An allegation that a group of pharmaceutical companies conspired to maintain monopoly prices on a best-selling prescription drug purchased by thousands of Wisconsin residents over several years meets the "substantially affects" test set forth in *Olstad,* 284 Wis. 2d 224, ¶ 85. We conclude that Meyers has sufficiently alleged that the challenged conduct of Bayer and the generic manufacturers substantially affected the people of Wisconsin and had impacts in this state. We therefore affirm the court of appeals' reversal of the circuit court's order dismissing the complaint.

---

[14] The complaint in *Emergency One,* 23 F. Supp. 2d 959, alleged only that 3500 to 4000 fire trucks are purchased by fire departments in the United States annually.

## IV

¶ 58. In summary, we reaffirm the following standard set forth in *Olstad* for determining when Chapter 133 reaches interstate commerce: A plaintiff filing an action under Wisconsin's Antitrust Act must allege price fixing as a result of the formation of a combination or conspiracy that "substantially affects the people of Wisconsin and has impacts in this state" when the challenged conduct occurs predominately or exclusively outside this state. *Olstad,* 284 Wis. 2d 224, ¶ 85. We conclude that additional limitations Bayer and amici MMAC and WMC seek to read into the "substantially affects" standard are unsupported by our precedents and are contrary to the policy choices of the legislature.

¶ 59. Meyers' 35–page, 106–paragraph complaint alleges a broad price-fixing scheme affecting "at a minimum, thousands . . . in Wisconsin" who purchased the best-selling antibiotic Cipro "at any time since January 6, 1995." We conclude Meyers' complaint alleges illegal conduct that, if true, substantially affected the people of Wisconsin and had impacts in this state.[15] We therefore affirm the court of appeals' decision reversing the circuit court's order dismissing Meyers' claims, and remand the matter to the circuit court for further proceedings consistent with this opinion.

---

[15] As we previously indicated, *supra,* ¶ 4 n.4, issues regarding the validity or invalidity of the Cipro patent, and the effect of the possible invalidity of the patent on the legality of the Agreements have not been briefed by the parties, have not been developed in the record in this motion to dismiss, and are not properly before this court. These matters may be addressed by the circuit court on remand.

*By the Court.*—The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 60. DAVID T. PROSSER, J. (*dissenting*). Four years ago in *Conley Publishing Group Ltd. v. Journal Communications, Inc.,* 2003 WI 119, 265 Wis. 2d 128, 665 N.W.2d 879, this court was confronted with the question whether we should adopt *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993), as the law of Wisconsin governing predatory pricing under Wis. Stat. § 133.03. As we answered this question, we noted that "Wisconsin courts have [long] followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations." *Conley,* 265 Wis. 2d 128, ¶ 17.

¶ 61. In the course of explaining why Wisconsin should follow federal law, the writer of the opinion observed that "there is presently no Wisconsin case law governing predatory pricing claims under § 133.03(2)." *Id.,* ¶ 16. "The dearth of state antitrust precedent is not surprising because the scope of Chapter 133 is limited to intrastate transactions. *See Reese v. Associated Hosp. Serv.,* 45 Wis. 2d 526, 532, 173 N.W.2d 661 (1970)." *Id.*

¶ 62. Two years later, the same writer was forced to withdraw the phrase "the scope of Chapter 133 is limited to intrastate transactions" because the court unanimously upheld the application of Wisconsin's Little Sherman Act to interstate commerce in some circumstances. *Olstad v. Microsoft Corp.,* 2005 WI 121, ¶¶ 13, 74, 284 Wis. 2d 224, 700 N.W.2d 139.

¶ 63. Having opened the door to interstate antitrust enforcement in some circumstances, the court

thought it ought to comment briefly on what those "circumstances" were, even though that question had not been briefed.

¶ 64. Early in the opinion, the court quoted Professor Herbert Hovenkamp to the effect that "a state antitrust law of general application can virtually always be applied to a practice having *sufficient effects* within the state." *Id.,* ¶ 14 (emphasis added) (citation omitted). Then we added, "State law is precluded from regulating interstate commerce only if it 'unduly burden[s]' interstate commerce." *Id.* (citing Von Kalinowski, *Antitrust Laws & Trade Regulation* § 100.03 (2d. ed. 2004)).

¶ 65. At the end of the opinion, the court said:

> A civil plaintiff filing an action under Wisconsin's antitrust act must allege that (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state. [*State v.*] *Allied Chemical* [*& Dye Corp.*], 9 Wis. 2d [290,] 295[, 101 N.W.2d 133 (1960)]. Operating with lesser standards would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts. Questions of provincialism, favoritism, and undue burden on interstate commerce should be determined by resort to contemporary federal commerce clause jurisprudence. To say more is beyond the scope of this opinion.

*Id.,* ¶ 85.

¶ 66. Four things should be noted about this paragraph. First, the words "substantially affects" were borrowed from *Allied Chemical.* Second, the words

"substantially affects" imply a higher standard than "sufficient effects," quoted earlier in the opinion. Third, the second point is underscored by the following sentence: "Operating with lesser standards would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts." Fourth, the paragraph requires "impacts in this state."

¶ 67. In interpreting the phrase "jeopardize the action," it should be remembered that the court had recently considered two cases exploring the reach of Wisconsin jurisdiction. *See State v. Derek Anderson,* 2005 WI 54, 280 Wis. 2d 104, 695 N.W.2d 731; and *Tammie J.C. v. Robert T.R.,* 2003 WI 61, 262 Wis. 2d 217, 663 N.W.2d 734. The court did not want to encourage litigation that exceeded the jurisdiction of the state. As for the phrase "undermine the validity of our antitrust statute," *Olstad* discussed such issues as federal preemption and burden on interstate commerce in the opinion, and that context gives the phrase meaning. "Lilliputian harassment" conveys the image of a commercial Gulliver tied down by a multitude of antitrust litigants across the country.

¶ 68. *Olstad* speaks of "actionable conduct, such as the formation of a combination or conspiracy . . . within this state." *Olstad,* 284 Wis. 2d 224, ¶ 85. Surely, our statute is most potent when "actionable conduct" is formed within this jurisdiction. Conversely, when "illegal activity" occurs predominantly or exclusively outside this jurisdiction but has impacts in Wisconsin, the impacts in Wisconsin ought to be more substantial than what is "sufficient" for a purely Wisconsin "combination or conspiracy." *Olstad* did not intend to convert every

antitrust violation anywhere into a violation of Wisconsin law simply because the violation affected some people in Wisconsin.

¶ 69. Because I am unable to discern from the discussion in the majority opinion any meaningful limitation on antitrust suits against illegal activities outside this state, I respectfully dissent.

¶ 70. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The majority opinion concludes that the second amended complaint (the complaint) of the plaintiffs sufficiently alleges a violation of Wisconsin's antitrust law, Wis. Stat. § 133.03 (2005–06),[1] to withstand a motion to dismiss. Majority op., ¶ 4. It does so based on the complaint's allegations that an agreement concerning ciprofloxacin hydrochloride between Bayer AG and Barr Laboratories, Inc. (the Bayer-Barr agreement)[2] is a "price-fixing scheme" for ciprofloxacin hydrochloride that controlled the price for the drug "at any time since January 6, 1995." *Id.* The majority opinion concludes that, if proved, the price-fixing alleged is "illegal conduct" that "substantially affected the people of Wisconsin and had impacts in this state" thereby violating Wisconsin antitrust law. *Id.* However, it also recognizes that there are significant questions about the effect that Bayer's patent may have on the plaintiffs' claims. *Id.*, ¶ 4 n.4. It suggests that those questions be addressed in the circuit court on remand. *Id.*

¶ 71. I dissent because I would resolve the effect of Bayer's patent on the plaintiffs' claims at this time. I would do so because Bayer was granted a federal patent

---

[1] All further references to the Wisconsin Statutes are to the 2005–06 version, unless otherwise noted.

[2] The Bayer-Barr agreement, about which the plaintiffs complain, is not in the record before us.

for ciprofloxacin hydrochloride (the Cipro patent) that, in order to have subject matter jurisdiction for this antitrust action, Wisconsin courts must presume is valid. 28 U.S.C. § 1338(a). Presuming that Bayer's patent is valid, I conclude that the complaint does not allege facts that, if true, are sufficient to show illegal conduct or conduct that has an illegal effect. *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 91 (1902). Only illegal conduct or conduct that has an illegal effect violates Wisconsin's antitrust law. *Prentice v. Title Ins. Co. of Minn.*, 176 Wis. 2d 714, 725, 500 N.W.2d 658 (1993); *State v. Allied Chem. & Dye Corp.*, 9 Wis. 2d 290, 296, 101 N.W.2d 133 (1960). Furthermore, because the conduct alleged in the complaint is not illegal or alleged to have had an illegal effect, it cannot "substantially affect" the people in Wisconsin and have "impacts" in Wisconsin contrary to Wis. Stat. § 133.03. *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 85, 284 Wis. 2d 224, 700 N.W.2d 139. Accordingly, I would affirm the circuit court's dismissal of the complaint for failure to state a claim pursuant to Wis. Stat. § 802.06(2)(a)6, albeit on different grounds. Therefore, I respectfully dissent.

## I. BACKGROUND[3]

¶ 72. The gravamen of the complaint is that the agreement between Bayer, who owns the patent for ciprofloxacin hydrochloride that it markets under the trade name, "Cipro," and Barr, who applied to the United States Food and Drug Administration (FDA) for

---

[3] The facts used in the background narration have been taken from the complaint and from the public records of the United States Food and Drug Administration (FDA) and the United States Patent and Trademark Office (PTO). We may take judicial notice of public records of governmental agencies. *Perkins v. State,* 61 Wis. 2d 341, 346, 212 N.W.2d 141 (1973).

permission to manufacture and market a generic form of Cipro, is a price-fixing agreement that effected a monopoly for Cipro in Wisconsin. The complaint alleges Bayer's monopoly is illegal and violates Wis. Stat. § 133.03(2).

¶ 73. As background for this theory, the plaintiffs allege that Bayer held the patent for the active ingredient of Cipro, ciprofloxacin hydrochloride, and that the Cipro patent was granted to Bayer on May 29, 1984, as Patent No. 4,670,444. Bayer also received FDA approval to market Cipro in October of 1987. Bayer's initial patent for Cipro expired in December of 2003.[4]

¶ 74. On October 27, 1991, Barr applied to the FDA to manufacture and market a generic form of Cipro. Barr used a shortened form of application for FDA approval that is known as an Abbreviated New Drug Application, or ANDA. As part of the ANDA process, Barr asserted that its generic drug was the bioequivalent of Cipro. This assertion permitted FDA consideration of Barr's generic Cipro without the years of testing that Bayer had to undergo in order to obtain FDA approval for Cipro. Therefore, by piggybacking on Bayer's lengthy FDA new drug testing requirements, Barr's ANDA applied for FDA approval for the same drug to which the FDA had given Bayer approval. In its ANDA, Barr also alleged that Bayer's patent was invalid, which is one of the allegations required in order for the FDA to give preliminary approval to a generic equivalent of a patented drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

¶ 75. As is required by federal statute, Barr gave notice of its ANDA to Bayer. *See* 21 U.S.C. § 355(j)(2)(B)(iii). Within the statutory timeline of re-

---

[4] The public records of the PTO show that the PTO extended Bayer's patent for Cipro through June 8, 2004.

ceiving Barr's notice (45 days), Bayer filed a patent infringement suit against Barr. A patent infringement suit is required by federal statutes as a precursor to maintaining patent priority over a pending ANDA for the generic equivalent of a patented drug. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

¶ 76. The filing of Bayer's patent infringement suit stayed Barr's ANDA before the FDA for 30 months or until the conclusion of the patent infringement suit, whichever occurred first. *See id.* That 30–month stay would have ended on July 16, 1994. However, prior to settling Bayer's suit against Barr for patent infringement, Bayer and Barr executed a stipulation to extend the 30–month stay until a final judgment on the pending patent litigation was entered. The district court approved the stipulation and ordered that final consideration of Barr's ANDA before the FDA was stayed until the patent litigation concluded. *Bayer AG v. Barr Labs.,* No. 92CV391 (S.D.N.Y. Dec. 9, 1992); *see also* 21 U.S.C. § 355(j)(5)(B)(iii).

¶ 77. On January 6, 1995, the FDA gave "tentative approval" to Barr to market its drug, which approval was subject to Bayer's patent being held invalid or expiring. FDA's public records show that FDA final approval to manufacture and market a generic form of Cipro was not given to Barr until June 9, 2004.[5]

¶ 78. The complaint does not allege that the conduct set out in the Bayer-Barr agreement falls outside of Bayer's rights under the Cipro patent. It also does not allege that Barr, or anyone else, has ever contended that Bayer obtained its Cipro patent through fraud on the United States Patent & Trademark Office (PTO).

---

[5] We may take judicial notice of public records of governmental agencies. *Perkins,* 61 Wis. 2d at 346.

Rather, the complaint asserts that the Bayer-Barr agreement was entered into on January 8, 1997, and that it allocates "the entire United States market for Cipro to Bayer for at least six years" (January 2003) and that at Bayer's option Bayer could either: (1) supply Cipro for sale as a generic to Barr, who would operate as Bayer's licensee, or (2) supply all of the Cipro to purchasers itself and make specified payments to Barr.[6]

¶ 79. The Bayer-Barr agreement, together with a consent judgment, concluded Bayer's federal patent infringement suit. The consent judgment affirmed that Bayer owns the patent for Cipro; that it is valid and enforceable; and that Barr's generic form of Cipro infringed Bayer's patent. *Bayer AG v. Barr Labs.*, No. 92CV391 (S.D.N.Y. Jan. 16, 1997). There has been no appeal or collateral attack on that judgment.

¶ 80. Subsequent to the conclusion of the patent infringement action, Bayer re-submitted its patent to the PTO for review. Bayer's patent for Cipro was upheld in that proceeding as well.

## II. DISCUSSION

A. Standard of Review

¶ 81. A motion to dismiss challenges the legal sufficiency of the complaint to state a claim on which relief may be granted. *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 11, 283 Wis. 2d 555, 699 N.W.2d 205. For purposes of the motion, we generally

---

[6] Payments such as these are commonly referred to as "reverse" or "exit" payments. Anne-Marie C. Yvon, *Settlements Between Brand and Generic Pharmaceutical Companies: A Reasonable Antitrust Analysis of Reverse Payments*, 75 Fordham L. Rev. 1883, 1884 n.9 (2006).

accept as true all factual allegations made in the complaint. *Watts v. Watts,* 137 Wis. 2d 506, 512, 405 N.W.2d 303 (1987). Judicial notice may also be taken of facts from the public records of government agencies, here the PTO and the FDA. *See Perkins v. State,* 61 Wis. 2d 341, 346, 212 N.W.2d 141 (1973) (concluding that a court may take judicial notice of facts easily accessible and capable of immediate and accurate determination); *Wis. Power & Light Co. v. City of Beloit,* 215 Wis. 439, 444, 254 N.W. 119 (1934) (taking judicial notice of the files of the public service commission); *Hillier v. Lake View Mem'l Park, Inc.,* 208 Wis. 614, 622, 243 N.W. 406 (1932) (taking judicial notice of incorporation records in the office of secretary of state).[7] However, on a motion to dismiss, courts do not accept "facts which the court will take judicial notice are not true, nor does the rule [of accepting facts pled in the complaint] apply to legally impossible facts." *Cohen v. United States,* 129 F.2d 733, 736 (8th Cir. 1942). We also are not required to accept factual statements that are not credible. *See Ferraro v. Koelsch,* 119 Wis. 2d 407, 410–11, 350 N.W.2d 735 (Ct. App. 1984). Furthermore, we are not required to accept legal conclusions pled in the complaint. *John BBB Doe v. Archdiocese of Milwaukee,* 211 Wis. 2d 312, 331, 565 N.W.2d 94 (1997).

¶ 82. We interpret the application of statutes independently of the court of appeals and the circuit court, but benefiting from the analyses of both prior decisions. *Spiegelberg v. State,* 2006 WI 75, ¶ 8, 291 Wis. 2d 601, 717 N.W.2d 641. And finally, whether a legal doctrine can shield defendants from liability un-

---

[7] For a detailed exposition of judicial notice of facts by appellate courts see George R. Currie, *Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation,* 1960 Wis. L. Rev. 39 (1960).

der Wisconsin's antitrust law that would otherwise be accorded to the complained of conduct is a question of law. *Prentice,* 176 Wis. 2d at 721.

B. Wisconsin Antitrust Claim

¶ 83. There have been approximately 30 cases filed throughout the United States, in state and federal courts, that make antitrust claims against Bayer and Barr based on the same Bayer-Barr agreement that is at issue here. *Meyers v. Bayer AG,* 143 F. Supp. 2d 1044, 1046 (E.D. Wis. 2001). Many of those cases have been consolidated in the Eastern District of New York under the scholarly attention of District Court Judge David Trager. *See In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F. Supp. 2d 514 (E.D.N.Y. 2005).

¶ 84. The case now before us was filed in state court, removed to federal court and remanded to state court because the federal district court determined that mounting a patent defense to a state antitrust claim did not cause the matter "to arise under" federal law. *Meyers,* 143 F. Supp. 2d at 1051. The federal district court did not analyze whether a state claim had been stated without plaintiffs alleging that Bayer's Cipro patent was invalid. In addition, the district court did not address whether the conduct alleged in the complaint exceeded Bayer's rights under its Cipro patent.

1. General patent law principles

¶ 85. In order to adequately address the defendants' motion to dismiss the complaint, there are certain general principles of federal patent law that must be recognized. That recognition is necessary before a court can evaluate a complaint wherein a patent owner is sued, in order to sort out which allegations are factual

337

allegations of a type that must be accepted for purposes of a motion to dismiss, which allegations contain facts not accepted as true, and which allegations are actually legal conclusions.

¶ 86. A civil state court claim against a patent owner, such as Bayer, that alleges conduct relating to the patented invention and requests damages, must assume that the patent is valid and it must allege conduct that falls outside of the rights accorded under the patent. This is so because if the complaint were to allege that the patent is invalid, there would be no subject matter jurisdiction in Wisconsin state courts to hear the claim. 28 U.S.C. § 1338(a);[8] *Schecher v. Purdue Pharma L.P.,* 317 F. Supp. 2d 1253, 1257 (D. Kan. 2004);[9] *see also Vill. of Trempealeau v. Mikrut,* 2004 WI 79, ¶ 8 n.2, 273 Wis. 2d 76, 681 N.W.2d 190.[10] And, if all the conduct that is alleged falls within the rights granted by the federal government to the patentee, the conduct is not illegal nor is its effect illegal. *United States v. General Elec. Co.,* 272 U.S. 476, 489–90 (1926).

---

[8] 28 U.S.C. § 1338(a) provides, "The districts courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . . Such jurisdiction shall be exclusive of the courts of the states."

[9] [D]istrict courts have exclusive original jurisdiction over actions "arising under" federal patent laws, i.e., in an action challenging the validity or enforceability of the patent. *Schecher v. Purdue Pharma L.P.,* 317 F. Supp. 2d 1253, 1257 (D. Kan. 2004).

[10] *Village of Trempealeau v. Mikrut,* 2004 WI 79, 273 Wis. 2d 76, 681 N.W.2d 190, explains that as a general proposition, circuit courts have broad subject matter jurisdiction; however, "[f]ederal law may confer exclusive jurisdiction over certain subject matters to the federal courts, precluding state court jurisdiction in those areas by operation of the Supremacy Clause." *Id.,* ¶ 8 n.2.

It is important to continue to note that only illegal conduct or conduct that has an illegal effect violates Wis. Stat. § 133.03. *Olstad,* 284 Wis. 2d 224, ¶ 85; *Prentice,* 176 Wis. 2d at 721.

¶ 87. Antitrust law generally forbids agreements that restrict output and raise prices above that which would be achieved in normal market competition. *See* Phillip Areeda & Herbert Hovenkamp, *Vol. X Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 1780a (2d ed. 2004). However, if a patent owner acts solely within the rights granted under the patent, the patent owner has a lawful monopoly and is "freed from competition of price, service, quality or otherwise." *United States v. Line Material Co.,* 333 U.S. 287, 300 (1948).

¶ 88. As the United States Supreme Court has explained:

"A patent by its very nature is affected with a public interest . . . [It] is an exception to the general rule against monopolies and to the right to access to a free and open market."

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177 (1965) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 816 (1945)). It is black letter law that a patent "is an exception to the general rule against monopolies." *Ciprofloxacin,* 363 F. Supp. 2d at 523 (quoting *Precision,* 324 U.S. at 816).

¶ 89. Therefore, agreeing to operate as a monopoly that fixes price for a patented invention is not illegal because monopoly rights exercised within the confines of the patent are granted by the federal government with the patent. As the United States Supreme Court has explained:

339

> [T]he general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. *The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal.*

*Bement,* 186 U.S. at 91 (emphasis added). In support of this monopoly, the federal law grants to a patent owner "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a)(1). The "essence of a patent grant is the right to exclude others from profiting by the patented invention." *Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 215 (1980). The rationale for granting such monopolies to patent owners is to encourage inventions. *Brenner v. Manson,* 383 U.S. 519, 534 (1966).[11]

¶ 90. The monopoly rights accorded to a patent owner also include the right to control the price charged for the patented invention by a licensee of the patent owner. *General Elec.,* 272 U.S. at 489–90. In *General*

---

[11] The freedom to take actions within the rights granted to a patent owner that would otherwise be unlawful has a limitation. If the patent was obtained "by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent applicant, [but] he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained," the patent will provide no shield to claims of unlawful anticompetitive conduct. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 179 (1965) (Harlan, J., concurring).

*Electric,* the government alleged that General Electric was engaged in illegal price-fixing of lamps through an agreement with Westinghouse. *Id.* at 478. General Electric owned the patents necessary for the construction of certain tungsten filament lamps. *Id.* at 480–81. Westinghouse was one of General Electric's licensees to sell the lamps as part of a nationwide sales and distribution plan. *Id.* at 481–82. In considering the government's allegation that General Electric imposed a price-fixing condition on Westinghouse's sales, the Court concluded price-fixing on sales by a licensee was permissible so long as the price-fixing stopped with the licensee and did not continue to fix the prices charged by those who purchased from the licensee for subsequent sale. *Id.* at 485. The court explained:

> [U]nder the patent law the patentee is given by statute a monopoly of making, using and selling the patented article. The extent of his monopoly in the articles sold and in the territory of the United States where sold is not limited in the grant of his patent, and the comprehensiveness of his control of the business in the sale of the patented article is not necessarily an indication of illegality of his method. As long as he makes no effort to fasten upon ownership of the articles he sells control of the prices at which his purchaser shall sell, it makes no difference how widespread his monopoly. It is only when he adopts a combination with others, by which he steps out of the scope of his patent rights and seeks to control and restrain those to whom he has sold his patented articles in their subsequent disposition of what is theirs, that he comes within the operation of the Anti-Trust Act.

*Id.*

¶ 91. Therefore, as we examine the complaint, we must: (1) presume Bayer's Cipro patent is valid because the plaintiffs claims are before a Wisconsin state

341

court; and (2) assess whether any factual allegation relating to the Bayer-Barr agreement falls outside Bayer's right to maintain a monopoly on the price Bayer or its licensee charges for Cipro. With these general principles of patent law in mind, I turn to Wisconsin antitrust law.

## 2. State antitrust principles

¶ 92. Wisconsin's antitrust law is set out in ch. 133 of the Wisconsin Statutes. The operative provision at issue in the case before us is Wis. Stat. § 133.03. It provides in relevant part:

> Unlawful contracts; conspiracies. (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. . . .
>
> (2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce is guilty.

¶ 93. Wisconsin antitrust law follows federal antitrust law in most respects. *State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 568–69, 261 N.W.2d 147 (1978). For example, both federal and state laws prohibit conspiracies to restrain trade and monopolies of the market. 15 U.S.C. §§ 1, 4, 15; Wis. Stat. § 133.03. However, Wisconsin antitrust law differs from federal antitrust law in that Wisconsin law may permit the recovery of damages by "indirect purchasers"[12] alleging

---

[12] The plaintiffs in the case before us are all "indirect purchasers" of Cipro because they did not purchase Cipro directly from Bayer or Barr. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 726 (Ill. 1977).

unlawful anticompetitive conduct, *Olstad,* 284 Wis. 2d 224, ¶ 63, but federal law does not. *Ill. Brick Co. v. Illinois,* 431 U.S. 720, 730–31 (Ill. 1977).

¶ 94. The most recent Wisconsin Supreme Court decision interpreting Wis. Stat. § 133.03 is *Olstad.* There we addressed the certified question: "Does Wisconsin's antitrust act, Wis. Stat. § 133.03, apply to interstate commerce affecting Wisconsin commerce?" *Olstad,* 284 Wis. 2d 224, ¶ 10. Olstad claimed that Microsoft's share of the market for personal computer operating systems was so large that it prevented others from entering the market. *Id.,* ¶¶ 2–3. Olstad alleged that Microsoft's anticompetitive conduct caused Wisconsin consumers to pay higher prices. *Id.,* ¶ 7. The circuit court dismissed the action after concluding that § 133.03 did not apply to interstate conduct. *Id.,* ¶ 9.

¶ 95. We concluded that "at least in some circumstances" Wis. Stat. § 133.03 does apply to interstate conduct. *Id.,* ¶ 74. Our limited conclusion was based in large part on our prior holding in *Allied Chemical & Dye,* where we addressed whether Wisconsin could apply its antitrust law to the sales of calcium chloride made in Wisconsin through interstate commerce when those sales were subject to the federal antitrust law. *Allied Chem. & Dye,* 9 Wis. 2d at 292. We concluded that Wisconsin law could be applied in some circumstances, in part because there was no conflict between federal and state antitrust laws. *Id.* at 295.

¶ 96. In *Olstad,* we also set out a test to assist courts and the public ascertain when Wis. Stat. § 133.03 may reach interstate actions. As a very general framework, we explained that either: (1) "actionable conduct, such as the formation of a combination or conspiracy," must have occurred within Wisconsin, or (2) if the actionable conduct occurred predominantly or ex-

clusively outside of Wisconsin, the "illegal activity" must "substantially affect" the people of Wisconsin and have "impacts" in Wisconsin. *Olstad,* 284 Wis. 2d 224, ¶ 85. We advised that the test was to be interpreted in a restrictive fashion so that Wisconsin's antitrust law would be available on only a limited basis with regard to interstate conduct:

> Operating with lesser standards would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts. Questions of provincialism, favoritism, and undue burden on interstate commerce should be determined by resort to contemporary federal commerce clause jurisprudence.

*Id.*

¶ 97. It is important to note that *Olstad* does not address any issue that may arise in the application of state antitrust law in the context of a federal patentee's actions, where federal law may effect whether state law will be applied. Furthermore, in *Olstad,* we also did not address whether an indirect purchaser's claim based on conduct that occurred solely outside of Wisconsin should be subject to Wisconsin's antitrust law because that question was not brought to us for decision.

¶ 98. However, we have in past decisions shown that Wisconsin antitrust law will not be applied to each and every occasion where the claim of a state law violation is made. In *State v. Milwaukee Braves, Inc.,* 31 Wis. 2d 699, 144 N.W.2d 1 (1966), we carefully considered the lack of federal prosecution of interstate conduct and what impact that should have on our decision about the prosecution of an antitrust claim under Wisconsin law.

¶ 99. *Milwaukee Braves* involved a state antitrust action brought against the Braves and others by the

State, due to major league baseball's decision to move the club to Atlanta, while refusing to permit another major league baseball team to locate in Milwaukee. *Id.* at 703–04. We acknowledged that a "substantial injury to business activity within Wisconsin" was caused by the exercise of major league baseball's monopoly power. *Id.* at 719. We explained that "organized baseball is interstate commerce and Congress may therefore regulate it." *Id.* at 720. However, we noted that major league baseball had not been subjected to prosecution under federal antitrust law. *Id.* at 721.

¶ 100. When considering how to determine whether that de facto exemption from federal antitrust law could cause a conflict with the application of state antitrust law in regard to the decision to move the Braves, we framed the question as: "whether there is a conflict between state and federal policy, so that the state policy must yield." *Id.* We concluded that federal choice must control and Wisconsin could not enforce its antitrust law based on the "concerted action" of moving the Braves from Milwaukee and refusing Milwaukee another major league baseball franchise. *Id.* at 732.

¶ 101. In *Prentice,* we once again addressed whether prosecution of alleged conduct, which if proved true, appeared to violate Wisconsin antitrust law, should proceed. *Prentice* was brought as a class action against "twelve title insurance companies and several of their employees." *Prentice,* 176 Wis. 2d at 720. It was claimed that the defendants engaged in a conspiracy to restrain trade, causing the consumer "plaintiffs to pay substantially higher prices for title insurance and related services than they would have had to pay in the absence of the alleged conspiracy." *Id.* At issue was

345

"whether the filed rate doctrine shield[ed] the defendants from liability" under Wisconsin's antitrust law. *Id.* at 721.

¶ 102. In *Prentice,* we explained how a regulatory agency's approval of a rate "established the lawfulness" of a rate; and therefore, the "legal rights of the parties were measured solely by the filed rate." *Id.* at 722. We concluded that because the insurance companies filed the rates they would charge pursuant to the provisions of Wis. Stat. § 625.15(2) (1977–78) and the agency had approved those rates under the filed rate doctrine, the rates charged were lawful rates. *Id.* at 725. Therefore, the title insurance companies and their employees were not subject to prosecution under Wisconsin antitrust law. *Id.* This discussion demonstrates that while Wisconsin's antitrust law may initially appear to be applicable, there are occasions when it will not be applied because to do so would interfere with other federal or state laws or doctrines.

### 3. Plaintiffs' claims

¶ 103. I now turn to the plaintiffs' claims in the suit before us. The complaint acknowledges that Bayer is the holder of the patent for Cipro. It alleges that Barr's generic drug is the "bioequivalence" of Cipro.

¶ 104. Plaintiffs' allegation of the existence of Bayer's Cipro patent is significant because all patents are presumed to be valid. 35 U.S.C. § 282. Furthermore, Bayer's patent for Cipro has been adjudged valid and enforceable. *Bayer AG v. Barr Labs.,* No. 92CV391 (S.D.N.Y. Jan. 16, 1997). And finally, if the plaintiffs were attacking the validity or enforceability of the patent through the allegations that are made in the complaint, there would be no subject matter jurisdic-

tion in Wisconsin courts to hear their claims. *Schecher,* 317 F. Supp. 2d at 1257.

¶ 105. Plaintiffs nonetheless allege that in the absence of the Bayer-Barr agreement, Barr would have begun marketing generic Cipro January 6, 1995.[13] This can be true under only one condition for a claim made in state court—the monopoly set out in the Bayer-Barr agreement must fall outside of Bayer's right to maintain a monopoly for Cipro throughout the term of the patent. *Ciprofloxacin,* 363 F. Supp. 2d at 524. Stated otherwise, "the conduct at issue is illegal if it threatens competition in areas other than those protected by the patent and [if not, it] is otherwise legal." *Id.* (quoting *United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1127 (D.C. Cir. 1981)). Therefore, while not every monopoly that an owner of a patent maintains is lawful, in order to withstand a motion to dismiss, a complaint against a patent owner must allege some conduct, which if proved true, falls outside of the conduct protected under the patent during the entire term of the patent.[14]

---

[13] This date predates FDA final approval to Barr, which according to the FDA's public records occurred on June 9, 2004.

[14] For example, while one who owns a patent can price-fix for the patented invention to those to whom it or its licensees sell, it cannot lawfully fix the price for the patented invention that will be charged by those to whom the patent owner or its licensees have sold. *General Elec.,* 272 U.S. at 485. In addition, a licensee who has rights under a former provision in the Hatch-Waxman Act to act as the first generic producer for 180 days on the expiration of the patent (21 U.S.C. § 355(j)(5)(B)(iv)) cannot lawfully agree to delay the commencement of the 180–day period and in so doing, extend the patent beyond the term granted by the PTO. *In re Cardizem CK Antitrust Litig.,* 332 F.3d 896, 907–08 (6th Cir. 2003).

¶ 106. I accept the following allegations of plaintiffs as true for purposes of this motion: (1) The Bayer-Barr agreement consented to "fix, raise, maintain, and stabilize the price of Cipro." (2) The Bayer-Barr agreement "provides that Bayer has the option to either: (a) license and supply Bayer-manufactured Cipro to Barr [] for resale under a generic label; or (b) pay quarterly amounts to Barr from 1998 through at least 2003." (3) The Bayer-Barr agreement "set forth the prices that Bayer may charge to Barr [], if Bayer chooses to supply its Cipro to Barr [] for resale [and] requires Barr [] to share with Bayer in profits from the resale of generically labeled Cipro manufactured by Bayer [and] [] limits the ability of Barr [] to price Cipro licensed from Bayer independently."

¶ 107. None of these allegations is sufficient to state a claim under Wis. Stat. § 133.03 because none of the alleged conduct is illegal and the monopolistic effect of the conduct is not illegal. The price-fixing conduct and the monopoly that is alleged to have resulted come within the rights granted to Bayer by the federal government when it issued the Cipro patent. *General Elec.,* 272 U.S. at 485; *Bement,* 186 U.S. at 91.

¶ 108. There are other allegations in the complaint that appear factual, but are either legal conclusions that I do not accept for purposes of a motion to dismiss, *John BBB Doe,* 211 Wis. 2d at 331, or they are facts for which I take judicial notice that they are not true or are not legally possible. *Cohen,* 129 F.2d at 736. For example, we need not accept the allegation, repeated in many forms in the complaint, that were it not for the Bayer-Barr agreement, Barr would have begun to manufacture and market generic Cipro in January of 1995.

¶ 109. According to the public records of the PTO, Bayer's original patent for Cipro did not expire until December 2003 and was extended through June 8, 2004. Furthermore, Barr had received only "tentative" FDA approval in January of 1995. The public records of the FDA show Barr did not have FDA approval to market generic Cipro until June 9, 2004. Therefore, unless Bayer's Cipro patent is invalid—a position that the plaintiffs cannot maintain in this lawsuit in state court—it would have been a violation of federal law for Barr to market generic Cipro before June 9, 2004. Therefore, in the context of a motion to dismiss, plaintiffs' repeated allegation in this regard does not cause their complaint to state a claim.

¶ 110. The majority permits plaintiffs' claims to proceed because plaintiffs allege:

> a broad price-fixing scheme affecting "at minimum, thousands . . . in Wisconsin" who purchased the best-selling antibiotic Cipro "at any time since January 6, 1995." We conclude Meyers' complaint alleges illegal conduct that, if true, substantially affected the people of Wisconsin and had impacts in this state.

Majority op., ¶ 4. The quote above shows that the majority opinion errs because it does not consider the context in which the complaint is made, i.e., it is made against the lawful owner of the federal patent for Cipro. *Bayer AG v. Barr Labs.*, No. 92CV391 (S.D.N.Y. Jan. 16, 1997) (concluding that Bayer owns the Cipro patent, which is valid and enforceable).[15]

---

[15] That the plaintiffs' claim is made against the patent owner for Cipro was argued to the circuit court. It was not briefed for us because the circuit court dismissed the complaint on other grounds and the court of appeals reviewed only the grounds employed by the circuit court. However, many ques-

¶ 111. The majority opinion gives credence to the complaint's assertion that "as a result of the Agreement, Bayer maintained its monopoly of the United States market for Cipro and generic equivalents of Cipro." Majority op., ¶ 13. The quoted phrase, "as a result of the Agreement" from the majority opinion incorporates a conclusion of law. It does not recite a fact because the Bayer-Barr agreement could have caused Bayer to have a monopoly for Cipro only if Bayer's Cipro patent were invalid. *General Elec.*, 272 U.S. at 485; *Bement*, 186 U.S. at 91. Otherwise, the monopoly is a result of the patent. Throughout the majority opinion it *assumes* the alleged conduct is illegal. This is a conclusion of law inappropriate for a motion to dismiss, unless there are facts alleged, which if true, were sufficient to support that conclusion. No such facts have been alleged in the complaint. And, as I explained above, price-fixing and monopolies within the rights granted with the Cipro patent are legal. *Bement*, 186 U.S. at 91 (explaining that "[t]he fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal").

¶ 112. Only illegal conduct or conduct that has an illegal effect violates Wisconsin's antitrust law. *Prentice*, 176 Wis. 2d at 721; *Allied Chem.*, 9 Wis. 2d at 296. Therefore, it is not just that price-fixing occurred and that it had a monopolistic effect, the price-fixing to attain a monopoly for Cipro must be illegal or the effect of the conduct must be illegal. The allegations of both the conduct and its effect set out in the complaint are not illegal under controlling federal law. *General Elec.*, 272 U.S. at 485.

---

tions about the effect of Bayer's Cipro patent on the plaintiffs' claims were asked of counsel for all parties at the oral argument before us.

¶ 113. Furthermore, under Wis. Stat. § 133.03, only illegal conduct or conduct that has an illegal effect can "substantially affect" the people of Wisconsin and have "impacts" that violate Wisconsin antitrust law. *Olstad,* 284 Wis. 2d 224, ¶ 85; *Allied Chem.,* 9 Wis. 2d at 295. It is beyond question that not all price-fixing or monopolies are illegal. In the case before us, given the presumption that Bayer's Cipro patent is valid and enforceable, none of the conduct alleged is illegal, nor is the monopolistic effect of the conduct illegal. *General Elec.,* 272 U.S. at 485; *Bement,* 186 U.S. at 91. Therefore, because of the nature of a patent, any adverse effects on the market that were caused by actions that fall within the scope of a patent owner's rights under the patent cannot be addressed by antitrust law. *Ciprofloxacin,* 363 F. Supp. 2d at 524; *see also Prentice,* 176 Wis. 2d at 721. Only conduct that threatens competition in areas other than those that are protected by the rights under a patent can be illegal under federal antitrust law. *Ciprofloxacin,* 363 F. Supp. 2d at 524. No such conduct has been alleged in the complaint before us. Therefore, defendant's motion to dismiss should be granted.

### III. CONCLUSION

¶ 114. Because the conduct alleged in the complaint is not illegal or alleged to have had an illegal effect, it cannot "substantially affect" the people in Wisconsin and have "impacts" in Wisconsin contrary to Wis. Stat. § 133.03. *Olstad,* 284 Wis. 2d 224, ¶ 85. Therefore, I would affirm the circuit court's dismissal of the complaint for failure to state a claim pursuant to Wis. Stat. § 802.06(2)(a)6, albeit on different grounds. Accordingly, I respectfully dissent.

¶ 115. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this dissent.